WOODROW D. MARRIOTT, ET AL.

V.

VIRGIL L. HARRIS, ET AL.

Record No. 841876

COKE L. GAGE

V.

VIRGIL L. HARRIS, ET AL.

Record No. 841884

VIRGIL L. HARRIS, ET AL.

V.

DIVERSIFIED MORTGAGE INVESTORS

Record No. 841886

April 22, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Thomas, and Whiting, JJ., and Harrison, Retired Justice

202

204

*William E. Rollow (Joanne F. Alper; Cohen, Gettings, Alper and Dunham*, on briefs (Record No. 841876)

*Robert K. Richardson (Odin, Feldman & Pittleman, P.C.*, on brief), for appellees. (Record No. 841876)

*Haynie S. Trotter (Janis Orfe; Boothe, Prichard & Dudley*, on briefs), for appellant. (Record No. 841884)

*Robert K. Richardson (Odin, Feldman & Pittleman, P.C.*, on brief), for appellees. (Record No. 841884)

■

*Robert K. Richardson (Odin, Feldman & Pittleman, P.C.*, on brief), for appellants. (Record No. 841886)

No brief or argument for appellee. (Record No. 841886)

CARRICO, C.J., delivered the opinion of the Court.

These three appeals stem from litigation involving the collapse of the development of Crows Nest Harbour, a large subdivision project in Stafford County. We dealt with another phase of the collapse in *Bd. of Sup.* v. *Safeco*, 226 Va. 329, 310 S.E.2d 445 (1983), where the Board of Supervisors of Stafford County sought to enforce the provisions of performance bonds given by the developer to assure the construction of roads, waterlines, and sewerage facilities in the subdivision.

In 1971, a limited partnership was formed for the purpose of developing Crows Nest Harbour. The partnership was composed of Coke Gage and FVM Corporation, as general partners, and Research Homes, Inc., Woodrow D. Marriott, Frank J. Johnson, Bicknell A. Robbins, and William J. Durkin,[1] as limited partners.

The partnership contemplated developing Crows Nest Harbour as a planned resort community on a 4,726-acre tract, complete with homes, schools, commercial sites, and recreational areas, all served by roads, waterlines, and sewerage facilities. In the first stage of development, five sections were planned and appropriate zoning was obtained. Subdivision plats for four sections, A, B, C, and D, were approved by the county and recorded by the developer. Of the 346 lots platted, 313 were sold pursuant to sales contracts which called for settlement within 120 days after the date a contract was signed or a subdivision plat recorded, whichever was later. The contracts also provided for the execution by purchasers of promissory notes secured by first deeds of trust for the balance of the purchase price.[2]

Similar provisions were contained in contracts covering sales of lots in Section E. No plat of that section was ever recorded, however, and purchasers of those lots were unable to acquire title thereto.

---

[1] William J. Durkin died sometime prior to the commencement of the present litigation. His estate has participated in the litigation below and in this appeal.

[2] It is stated in the brief of the appellees in Record No. 841876, and not challenged, that payments on the promissory notes "started the month after contracting."

In connection with the development, the partnership applied to the United States Department of Housing and Urban Development (HUD) for approval of the project. The partnership submitted to HUD a written property report in accordance with the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq*. The report described the plan of development and contained the representation that the "[d]eveloper will install water and sewer facilities, roads, and underground utilities by December 31, 1974, unless prevented or delayed by governmental action or inaction beyond developer's control." The contracts used by the partnership for sales of lots made specific reference to the HUD property report.

Financing for the project was provided by Diversified Mortgage Investors (DMI) in the form of a construction/development loan for $14,600,000. As each lot was sold, the partnership assigned to DMI the sales contract, along with the promissory note and deed of trust the purchaser had signed. Thereafter, the purchaser made payments to DMI.

The closing of the DMI loan coincided with the attempted withdrawal from the partnership by Gage, Marriott, Johnson, Robbins, and Durkin. The withdrawing partners received a total of $770,000 in cash and $2,030,000 in promissory notes. An amended certificate of limited partnership, purportedly eliminating the withdrawing partners, was filed. The trial court held, however, that the certificate did not comply with applicable statutes and was ineffective "to remove or substitute partners or to permit withdrawal of funds."

The proposed roads, waterlines, and sewerage facilities were not installed by December 31, 1974, the date indicated in the HUD property report, or at any other time. Indeed, by December 31, 1974, the partnership had abandoned the project, and it later filed for bankruptcy. Therefter, purchasers ceased making payments on their promissory notes.

In July 1975, Stafford County approved a comprehensive development plan. Then, in June 1978, the county downzoned the Crows Nest tract to "A-2-Rural Residential," making the tract ineligible for central water and sewer service.

On July 13, 1978, Virgil L. Harris and numerous other lot purchasers (the plaintiffs) filed a bill of complaint against Crows Nest Harbour Limited Partnership, FVM Corporation, Research Homes, Inc., Diversified Mortgage Investors, Coke L. Gage, Woodrow Marriott, Frank K. Johnson, Bicknell A. Robbins, and

the William J. Durkin Estate (the defendants).[3] In Count I of the complaint, the plaintiffs sought to have the court rescind and declare void the sales contracts, promissory notes, and deeds of trust they had signed. The purchasers also sought refund of all the money they had paid. Count II contained an allegation of fraud and sought rescission of the sales contracts, refund of all money paid by the plaintiffs, and recovery of $5,000,000 in punitive damages. Count III, as amended, alleged a breach of contract and sought damages of $2,560,257.41.

After the bill of complaint was filed, DMI sought to foreclose on the deeds of trust executed by the purchasers. The trial court initially enjoined foreclosure, but, as a result of an agreement reached among the parties, later permitted DMI to proceed with foreclosure, provided DMI would bid in the property itself and hold title in trust for the plaintiffs pending the outcome of the present litigation.

The defendants filed a number of different pleadings, including several demurrers. All were overruled except demurrers to Count II, relating to fraud, which were sustained.

Following extensive discovery, the parties exchanged motions for partial summary judgment. By three separate decrees entered September 24, 1984, the motions were granted in part and denied in part. The rulings embodied in the three decrees are the subjects of the three appeals initiated by the losing parties.

The decrees entered in Record Nos. 841876 and 841884 are interlocutory in nature, but they constitute decrees or orders "[a]djudicating the principles of a cause," Code § 8.01-670(B)(3), and, hence, are appealable. The decree in Record No. 841886 effected a complete dismissal of DMI from the case and, hence, was final as to DMI and appealable. Code § 8.01-670(A)(3).

### MARRIOTT v. HARRIS - RECORD NO. 841876

In the decree giving rise to this appeal, the trial court entered partial summary judgment in favor of the plaintiffs against Marriott, Johnson, Robbins, and the Estate of William J. Durkin (the Marriott defendants). The court ruled that the Marriott defendants could be held personally liable as general partners for the debts of the partnership because the original certificate of limited

---

[3] The trustees under the deeds of trust given by the purchasers were also named parties defendant.

partnership had been acknowledged rather than sworn to, as required by Code § 50-45.

The Marriott defendants contend the trial court's ruling was erroneous. They argue that a 1983 amendment to Code § 50-45 specifically cured the defect in the original certificate and that the court's ruling rendered the 1983 amendment a nullity.

▮ The original certificate of limited partnership was executed in 1971. At that time, Code § 50-45(1)(a) required that persons desiring to form a limited partnership must "[s]ign and swear to a certificate" setting forth salient facts.

This statutory requirement was considered in *Wisniewski* v. *Johnson*, 223 Va. 141, 286 S.E.2d 223 (1982). There, as here, the limited partnership certificate had been acknowledged rather than verified by oath. The trial court held the putative limited partners liable as general partners, and we affirmed. We said that "the appellants' failure to 'swear to' the certificate was such a noncompliance with the requirements of Code § 50-45 as to render the certificate ineffective for the creation of a limited partnership." *Id.* at 144, 286 S.E.2d at 225.

▮ *Wisniewski* was decided January 22, 1982. By an act approved April 7, 1982, effective July 1, 1982, the General Assembly added a new section numbered 50-45.2 which provided that a certificate "signed and acknowledged" would be deemed sufficient to satisfy the requirements of Code § 50-45(1)(a). The new section further provided:

> C. The acknowledgement before July 1, 1981, of a certificate or amended certificate of limited partnership, not false or misleading in any material respect, shall be deemed substantial compliance in good faith with any requirement that the certificate or amended certificate be signed or sworn to. The provisions of this subsection shall not apply to any litigation, pending or decided, on or before the effective date hereof.

Acts 1982, ch. 254. Then, at its 1983 session, the General Assembly amended and reenacted Code § 50-45 to state in (1)(a) that persons desiring to form a limited partnership shall "[s]ign and acknowledge, or swear to, a certificate" setting forth certain facts. The legislation also added a new subsection, which read:

(4) All certificates of limited partnerships under this section . . . accepted for filing for record shall be conclusively presumed properly sworn to, acknowledged or otherwise notarized, notwithstanding any defects or deficiencies in the form of swearing thereon or notarization or the party administering or taking such oath, acknowledgement or other notarial act, except in cases of fraud. All such certificates of acknowledgement, oaths or other notarial acts heretofore taken on such certificates or amendments heretofore filed are hereby declared valid and effective in all respects, if otherwise valid and effective according to law, except in cases of fraud.

Acts 1983, ch. 369.

On brief, the Marriott defendants argue that there was a clear and unavoidable inconsistency between the 1982 and 1983 amendments with respect to the validation of limited partnership documents which had been acknowledged rather than sworn to. The 1982 amendment, the argument continues, excepted from its validating provisions those partnership documents involved in pending or past litigation, while the 1983 amendment declared valid all certificates of limited partnership theretofore filed, with no exception made concerning litigation. Hence, the Marriott defendants conclude, this case is controlled by the rule enunciated in *Benrus Watch Co.* v. *Kirsch*, 198 Va. 94, 99, 92 S.E.2d 384, 388 (1956), that where there are two irreconcilable amendments, "the earlier . . . must yield and the later be given effect" because, while "repeal by implication is not favored, . . . if inevitable [it] is as effective as is an express statutory mandate."

The difficulty with the argument of the Marriott defendants is that the law has changed since they filed their appellate briefs. At its 1985 session, the General Assembly repealed Code §§ 50-44 through -73, which dealt with limited partnerships, and replaced them with Code §§ 50-73.1 through -73.77, dealing with the same subject, effective January 1, 1987. Acts 1985, ch. 607.

The 1987 revision does not require that a certificate of limited partnership be verified by oath or acknowledged. However, the provisions of former Code § 50-45.2(C), which embodied the 1982 validating amendment and contained the exception concerning past or pending litigation, were reenacted verbatim and are

now found in Code § 50-73.15(D).[4] But Code § 50-45(4), which consisted of the 1983 validating amendment without the exception, was not reenacted.

■ Now it is the plaintiffs who say they are entitled to invoke the most recently enacted statute. As the plaintiffs point out, we held in *Bain* v. *Boykin*, 180 Va. 259, 23 S.E.2d 127 (1942), that the law in effect at the time the appellate court decides a case is the governing law, except where substantive or vested rights would be affected. Under this rule, we look to the 1987 revision for resolution of the question to be decided in this case.

■ This is not to suggest that we think the trial court erred in deciding the way it did under the law as it then existed or that we agree with the Marriott defendants' argument that the 1983 amendment impliedly repealed the exception contained in the 1982 law. What we do say is that if there was any doubt whether the exception contained in the 1982 law survived the 1983 amendment, the 1987 revision with the exception intact removed the doubt in favor of survival.[5]

The Marriott defendants argue, however, that this is a case for application of the exception to the rule that the law in effect at the time of appellate decision controls. A new law will not be applied retroactively, the Marriott defendants maintain, if such application derogates from the rights of a party or produces manifest injustice.

■ While we do not think the Marriott defendants suffered any derogation of rights, their argument presents an interesting anomaly. If they are correct in saying that retrospective application of the 1987 revision would derogate from a right they obtained under the 1983 amendment and would cause them to suffer manifest injustice, then the plaintiffs would have just as strong an argument

---

[4] Code § 50-73.15(D) reads:

The acknowledgement before July 1, 1981, of a certificate or amended certificate of limited partnership, not false or misleading in any material respect, shall be deemed substantial compliance in good faith with any requirement that the certificate or amended certificate be signed or sworn to. The provisions of this subsection shall not apply to any litigation, pending or decided, on or before the effective date hereof.

[5] The Marriott defendants argue that the 1987 revision is "by its own terms, related only to the 1987 act" and is, therefore, inapplicable and irrelevant here. We disagree. We think the clear exception in Code § 50-73.15(D), relating to litigation pending or decided on or before January 1, 1987, by *its* own terms, is not only applicable but also highly relevant here.

that the 1983 amendment derogated from a right they obtained under the 1982 amendment and caused them to suffer manifest injustice. The obvious result, of course, would be a complete legal standoff. We avoid such a result by concluding that the 1987 revision controls.

The Marriott defendants next contend we should "balance the equities" in their favor. They argue that when the plaintiffs signed contracts to buy lots, they knew that Marriott, Johnson, Robbins, and Durkin were limited partners and they specifically agreed to take the lots " 'as is'," knowing that the promises concerning improvements in the subdivision were being made by a limited partnership.

We reject this contention. While this is a chancery matter, it is not at all clear that the equities favor the Marriott defendants and, in any event, this is not a proper situation for balancing the equities. The question for decision is clearly one of law, *viz.*, whether the failure of the parties to swear to the certificate of limited partnership makes the limited partners liable as general partners. And the answer to the question is found in purely legal sources, *viz.*, the *Wisniewski* decision and the subsequent actions of the General Assembly.

When the limited partnership certificate was executed in 1971, the law then in effect required an oath rather than an acknowledgement. Applying precisely the same law, we held in *Wisniewski* that the failure to swear to the certificate rendered it "ineffective for the creation of a limited partnership," 223 Va. at 144, 286 S.E.2d at 225, and also rendered the limited partners liable as general partners.

Then followed a series of statutory changes. First, in 1982, the General Assembly validated certificates acknowledged before July 1, 1981, but excepted litigation pending or decided on or before July 1, 1982. Next, in 1983, the General Assembly validated acknowledgements, oaths, or other notarial acts theretofore taken on certificates of limited partnership theretofore filed, without the exception concerning litigation. Finally, in the 1987 revision, the General Assembly reenacted the 1982 validating amendment verbatim, including the exception related to litigation.

In effect, what the General Assembly did in 1982 was to provide some but not all limited partners with a defense against a claim that they were liable as general partners because they acknowledged rather than swore to pre-July 1, 1981 certificates of

limited partnership. Then, in 1983, the General Assembly ostensibly extended the defense to all such limited partners. But in 1987, the General Assembly withdrew the defense from the same class of limited partners it had excluded in its 1982 enactment.

It is the misfortune of the Marriott defendants that they fall within the class of limited partners from whom the defense was withdrawn by the 1987 revision. Despite their contention to the contrary, there was litigation pending within the meaning of Code § 50-73.15(D) when the revision became effective on January 1, 1987, and, hence, they are not entitled to assert the defense.

The Marriott defendants have not questioned the authority of the General Assembly to take the action it did. Indeed, since they forcefully maintain that the General Assembly had the authority to enact the 1983 amendment, they will not be heard to say in the same breath that the General Assembly lacked the authority to enact the 1987 revision. Furthermore, as the Marriott defendants concede, "there are no vested rights in a potential result in pending litigation," and potential result is all the General Assembly's action affected.

We find that the ruling of the trial court in Record No. 841876 is without error.

## GAGE v. HARRIS - RECORD NO. 841884

In the decree from which this appeal emanates, the trial court awarded the plaintiffs partial summary judgment against Coke Gage, one of the original general partners in Crows Nest Harbour Limited Partnership. The court ruled that the plaintiffs' suit was not barred by the statute of limitations, that the partnership was obligated to install roads, waterlines, and sewerage facilities in the subdivision, that the purchasers of lots in Section E were entitled to rescission of their contracts, that purchasers in other sections were entitled to rescission upon proof of failure of consideration, and that the attempted withdrawal from the partnership by Gage was ineffective because the amended certificate of limited partnership was defective.

Gage first complains about the denial of his plea of the statute of limitations. Gage notes that this is a suit in equity, and he cites the rule that equity follows the law on a statute of limitations question, with the result that "if a legal demand be asserted in equity which at law is barred by statute, it is equally barred in

equity." *Sanford* v. *Sims*, 192 Va. 644, 649, 66 S.E.2d 495, 498 (1951).

Gage then says the plaintiffs have maintained throughout the case that the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* (the Act), is part of their contracts to purchase lots in Crows Nest Harbour. Yet, Gage continues, the plaintiffs induced the trial court to disregard the two-year limitation period applicable to certain remedies made available in the Act, under which the plaintiffs' suit would be barred, in favor of the five-year limitation applicable to contracts in writing provided by Va. Code § 8.01-246(2), under which, according to the trial court's ruling, the suit was timely filed.

Gage contends the trial court's application of the five-year limitation was erroneous, and he says other state court decisions support his position that the Act's limitation period applies to bar federal claims cognizable in state courts. *E.g., Orpheus Investments* v. *Ryegon Investments*, 447 So.2d 257, 259 (Fla. Dist. Ct. App. 1983). In several federal court decisions, Gage observes, the Act's two-year limitation period was held applicable rather than longer state periods of limitation. *McCaffrey* v. *Diversified Land Co., Inc.*, 564 F.2d 1241, 1243 (9th Cir. 1977); Jacobsen v. *Woodmoor Corporation*, 400 F. Supp. 1, 3-4 (W.D. Mo. 1975); *Hall* v. *Bryce's Mountain Resort, Inc.*, 379 F. Supp. 165 (W.D. Va. 1974).

But, as the plaintiffs point out, all the above cases were brought pursuant to the Act. Here, the trial court found that the plaintiffs' suit was not brought pursuant to the Act, and a reading of the plaintiffs' bill of complaint proves that the trial court's finding was eminently correct.

In the bill of complaint, the Act is not even mentioned. The only possible connection with the Act is found in an allegation of the bill that the partnership "through representations both oral and written including a property report . . . agreed . . . to dedicate and construct . . . water and sewer facilities, roads, and underground utilities on or before December 31, 1974." While the report may have been required by the Act, the plaintiffs' reliance upon the report as one of the bases of the partnership's obligation to construct improvements does not convert what is otherwise a suit to enforce state remedies into a proceeding under the Act.

The Act does not preempt state law. To the contrary, it specifically states that "[t]he rights and remedies provided by this

chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 1713.

■ It is clear that what the plaintiffs filed was an ordinary bill of complaint instituting a suit in equity upon written contracts, seeking alternative relief in the form of rescission on the ground of substantial failure of consideration or damages for breach of contract. " '[A] substantial failure of consideration is a well recognized ground for rescission of a contract . . . .' " *Andrews* v. *Sams*, 233 Va. 55, 59, 353 S.E.2d 735, 738 (1987) (quoting *Southeast Lumber Co.* v. *Friend*, 158 Va. 863, 869, 164 S.E. 372, 374 (1932)). For this type of proceeding, the statute of limitations in Virginia is five years, Code § 8.01-246(2), the limitation correctly applied by the trial court in this case.

Gage next attacks the portion of the decree which held that the partnership was obligated to install roads, waterlines, and sewerage facilities in the subdivision. In this connection, Gage questions the trial court's ruling that the HUD property report became part of the plaintiffs' contracts, which then obligated the partnership to make the improvements.

Citing *Degler* v. *Lake Holiday Estates, Inc.*, 406 F. Supp. 367 (W.D. Va. 1975), *rev'd on other grounds*, 556 F.2d 572 (4th Cir. 1977), Gage argues that a document does not become a part of a contract unless it is "specifically referred to . . . as part of the final agreement between the parties." Here, Gage says, there is no language that "expressly incorporates by reference the HUD Report."

■ In the contract form employed in this case, the following language appears in capital letters: "PURCHASER . . . HEREBY ACKNOWLEDGES RECEIPT OF A PROPERTY REPORT PREPARED PURSUANT TO THE INTERSTATE LAND SALES FULL DISCLOSURE ACT, THAT HE HAS READ AND UNDERSTANDS SUCH REPORT, [AND] THAT HE HAS INSPECTED THE LOT TO BE PURCHASED HEREBY . . . ." While this language may not be as specific as that employed in *Degler*, we think it is amply sufficient to make the property report part of the contracts in this case.[6]

---

[6] Gage also says the HUD report cannot be used to determine the parties' obligations because each contract specifies that it is the only agreement between seller and purchaser and that no representations have been made or relied upon which are not therein "provided [for] or set forth." But if, as we hold, the HUD report is part of each contract, then the representation contained therein is "provided [for] or set forth" in the contract.

As noted previously, the HUD property report contained the representation that the "[d]eveloper will install water and sewer facilities, roads, and underground utilities by December 31, 1974,[7] *unless prevented or delayed by governmental action or inaction beyond developer's control.*" (Emphasis added.) Gage seizes upon the emphasized language and argues that the approval in 1975 by Stafford County of a comprehensive development plan constituted governmental action preventing installation of the required improvements.

We pointed out in *Bd. of Sup.* v. *Safeco*, however, that the downzoning of the Crows Nest tract did not occur until 1978, long after the partnership had abandoned the project. We said that the development plan was only a guideline, not a zoning ordinance, and that the 1975 approval of the plan by the county "did not frustrate performance by [the partnership] of the bonded obligations." 226 Va. at 335, 310 S.E.2d at 448.

Hence, it was proper for the trial court to consider the representation in the HUD property report as evidence of the partnership's obligation to install roads, waterlines, and sewerage facilities in the subdivision. We also think it was proper for the trial court to consider notations on plats of the subdivision, which plats were specifically referred to in the sales contracts, as evidence of the partnership's obligations. We said in *Bd. of Sup.* v. *Safeco* that "[t]he plats showed streets, waterlines, and sewer lines which [the partnership] was to install in the subdivision." *Id.* at 333, 310 S.E.2d at 447.

Furthermore, we think it was not improper for the trial court to consider pertinent provisions of county subdivision ordinances in determining whether the partnership was obligated to install the improvements in question. One of these ordinances, effective 1968, stated that "[a]ll required improvements shall be installed by the subdivider at his cost," and the other, effective 1973, stated that "[a]ll required improvements shall be installed at the cost of the subdivider." Statutory or ordinance provisions in effect at the time a contract is executed become as much a part of the contract as if incorporated therein. *See Maxey* v. *American Cas. Co.*, 180 Va. 285, 290, 23 S.E.2d 221, 223 (1942).

---

[7] The original completion date in the HUD report was changed twice, first, to December 31, 1975, and, later, to December 31, 1976. The changes are immaterial.

█ Finally, on the question of the partnership's obligation to install improvements, we note an argument by Gage that the partnership was not obligated because the contracts in question contain a provision stating the property purchased was "to be conveyed 'as is.' " We think it would be absurd to say that the provision applies, not only to some physical defect in the property, but also to the plaintiffs' right to enforce the partnership's obligation to install roads, waterlines, and sewerage facilities. Accordingly, we reject the argument out of hand.

Gage's next contention concerns the portion of the decree dealing with the plaintiffs' entitlement to rescission of their contracts. With respect to the plaintiffs who purchased lots in Section E of the subdivision, the trial court ruled that because these plaintiffs had never received title, they suffered a complete failure of consideration and were entitled to rescission. With respect to the plaintiffs who purchased and received title to lots in Sections A, B, C, and D, the court denied summary judgment on the question of rescission because evidence would be required to determine whether there was such substantial failure of consideration as to warrant rescission.

Gage says the trial court erred with respect to both classes of plaintiffs. He first argues that "rescission of a contract may be granted only when there is a misrepresentation of an existing fact, *not* a prediction of a future occurrence," and that "a purchaser is not entitled to rescind a contract of sale because of representations relating to future improvements such as grading streets and laying water mains." Here, Gage says, all the allegations made by the plaintiffs related to the partnership's expectations for the future development of the subdivision and are not sufficient to support rescission.

█ This argument is wide of the mark. As noted previously, the plaintiffs' suit is based upon substantial failure of consideration, not material misrepresentation. In any event, one of the cases Gage cites shows the fallacy in his argument.

█ In *Watkins* v. *West Wytheville, &c., Co.*, 92 Va. 1, 22 S.E. 554 (1895), an action to recover on two bonds given by the defendant to secure deferred payments for the purchase of land, the defendant filed three pleas, alleging, *inter alia*, a failure of consideration and seeking recovery over. This Court held that the trial court had properly rejected the second and third pleas. Concerning the first plea, the Court said:

The first plea does not allege any fraud, misrepresentation, or other conduct on the part of the plaintiff that would entitle the defendant to the relief sought; but it does allege, substantially, that at the time of making the writings sued on, and contemporaneously with the contract of sale, and as a part thereof, the plaintiff, in consideration, that the defendant would purchase the lots, undertook, and . . . promised the defendant, that there should be constructed and built upon [the plaintiff's] lands . . . a hotel to cost not less than $50,000; that the defendant, relying upon this promise and undertaking of the plaintiff, did buy the lots and execute the writings sued on. It is further alleged that the plaintiff did not perform its promise or undertaking, and that by reason of the breach [the defendant] has suffered damage . . . .

92 Va. at 11-12, 22 S.E. at 556. We held that "[i]f the allegation made in [the first] plea can be supported by legal proof, the defendant would be entitled to recover, and hence it must be held to be a good plea." *Id.* at 12, 22 S.E. at 556. This precise holding is applicable to the case at bar and is dispositive of Gage's argument that the partnership's promise to install improvements was only "a prediction of a future occurrence."

Gage argues further that the plaintiffs failed to act timely in seeking rescission. A court of equity "aids one who has been vigilant," Gage opines, "and will refuse to give its aid to stale demands where one has slept on his rights." Here, Gage says, the plaintiffs waited to file suit until after the Crows Nest tract had been downzoned, with the result that the tract could not be served by central water and sewerage facilities, and, furthermore, many of the lots are now owned by DMI, "the lender which foreclosed against all lot purchasers whose notes it holds." Hence, Gage asserts, "no court can possibly restore the parties to the *status quo* that existed when the sales contracts were executed."

We think Gage's argument about what the plaintiffs did or did not do is irrelevant. It was not the plaintiffs' delay in filing suit that caused either the downzoning or the resulting loss of central water and sewerage service. Rather, it was because the partnership failed to install the required improvements that the downzoning had such dire results. Had the plaintiffs filed suit the day after the partnership abandoned the project, the improvements still

would not have been installed and the result would have been the same.

Neither can the fact that DMI foreclosed its deed of trust lien on many of the lots be attributed to the plaintiffs' delay in filing suit. Indeed, the foreclosure did not take place until after the plaintiffs' suit was filed. But aside from that, the foreclosure occurred because the plaintiffs did not make payments on their promissory notes and the plaintiffs stopped paying because the partnership abandoned the project without installing improvements it had agreed to install.

What, in effect, the partnership invites us to do is to set up its own breach of contract as a defense against the plaintiffs' suit. We decline the invitation.

Gage's final contention concerns the trial court's ruling that the amended certificate of limited partnership was ineffective to terminate Gage as a member of the partnership. The trial court held that the certificate was defective because it was not signed or sworn to by all members, including those withdrawing as well as those continuing, and because it did not set forth the amounts withdrawn by the departing partners.

The amended certificate was executed only by Research Homes, Inc., as the sole limited partner, and FVM Corporation, as the sole general partner continuing in the business. Gage argues that these were the only signatures required by the statutes then in effect, Code §§ 50-44 *et seq.*, and that there was no statutory requirement for a withdrawing general partner to execute an amended certificate. Gage makes no comment upon the trial court's ruling concerning the failure of the certificate to show the amount of funds withdrawn by the departing partners.

At the time the amended certificate was executed, Code § 50-59(1) provided that a limited partner could not withdraw any part of his contribution until "(b) the consent of all members [was] had . . ." and "(c) [t]he certificate is . . . so amended as to set forth the withdrawal or reduction." Code § 50-67(2) required that the certificate be amended when "(a) [t]here is a change in . . . the amount . . . of the contribution of any limited partner" and "(e) [a] general partner retires . . . and the business is continued" by the remaining general partner or partners. Code § 50-68(1)(b) provided that an amended certificate must "[b]e signed and sworn to by all members; and an amendment substituting a limited partner or adding a limited or general partner shall be

signed *also* by the member to be substituted or added." (Emphasis added.)

There can be no doubt that the filing of an amended certificate of limited partnership was necessary in this case. There was both a change in the amount of the contribution of limited partners and the retirement of a general partner, as contemplated by Code § 50-67(2)(a) and (e).

Nor can there be any doubt that the reference to "all members" in Code §§ 50-59(1)(b) and -68(1)(b) established the necessity for the execution of the amended certificate by both general and limited partners, those withdrawing as well as those continuing. Such execution was required to show the consent of all members to the withdrawal by the limited partners of their contributions, Code § 50-59(1)(b), and to show a change in the amount of the limited partners' contributions, Code § 50-67(2)(a). And use of the word "also" in Code § 50-68(1)(b) would be rendered meaningless unless the reference to "all members" in that section is read to include both withdrawing and continuing partners, general and limited.

Furthermore, while there may have been some question whether the amended certificate should have shown the amount withdrawn by Gage, the retiring general partner, Code §§ 50-59(1)(c) and -67(2)(a) clearly required the amendment to show the amount withdrawn by the limited partners. We think the failure of the certificate to show the amount withdrawn by the limited partners impacted upon Gage as well as the limited partners, since the statutory obligation to file a proper amendment fell equally upon all the members.

As filed, the amended certificate gave no indication that Gage had ever been a general partner or that Marriott, Johnson, Robbins, and Durkin had been limited partners or that all of them were withdrawing from the partnership. Nor did the amended certificate indicate that any former partner had withdrawn any funds from the partnership. Thus, the certificate did not comply with applicable statutes and, as the trial court found, "ineffective to remove or substitute partners or to permit withdrawal of funds."

We find the several rulings of the trial court in Record No. 841884 to be without error.

## HARRIS v. DIVERSIFIED MORTGAGE INVESTORS
### RECORD NO. 841886

In the decree from which this appeal was taken, the trial court ruled that DMI, as assignee of the sales contracts for lots in Crows Nest Harbour, acquired the right to receive payment on the promissory notes given by the purchasers but did not assume the partnership's obligations to install roads, waterlines, and sewerage facilities. The court also ruled that the promissory notes were negotiable instruments and that DMI took the notes for value without notice of claims or defenses.

The plaintiffs first contend the trial court erred in its holding on the question whether DMI assumed the partnership's obligations under the sales contracts. The plaintiffs argue that when DMI accepted the assignment of the sales contracts along with the promissory notes, knowing that the obligations of the partnership under the contracts were wholly executory, DMI also assumed the partnership's obligations.

The plaintiffs point to a clause in each of the sales contracts which provides that "[t]his Agreement may be assigned by the Seller and shall be binding upon and inure to the benefit of the parties hereto and the successors and assigns of each of them." The plaintiffs then cite *Citizens Suburban Co.* v. *Rosemont Development Co.*, 244 Cal. App. 2d 666, 53 Cal. Rptr. 551 (1966), for the proposition that "[a] clause binding 'successors and assigns' is designed to eliminate the necessity for an express assumption of burdens" by the assignee. *Id.* at 675, 53 Cal. Rptr. at 557.

While *Citizens Suburban* v. *Rosemont* is distinguishable factually, a more important difference makes the case inapposite here. The California court acknowledged that "[a]t common law an assignment transfers the benefits of an executory contract but not its burdens, unless the assignee expressly assumes the latter." *Id.* The court then made the ruling, upon which the plaintiffs rely here, that "[a] clause binding 'successors and assigns' is designed to eliminate the necessity for an express assumption of burdens" by the assignee. *Id.* But the court based its ruling on the proposition that "the notion of succession bears strong parallels to the declaration of Civil Code section 1589: 'A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations rising from it, so far as the facts are known, or ought to be known, to the person accepting.' " *Id.* at 676, 53 Cal. Rptr. at 557-58.

The plaintiffs here cannot point to a Virginia counterpart of California Civil Code section 1589. They assert, however, that "Virginia has adopted the rule that, when an executory bilateral contract is assigned under a general assignment, the assignee becomes not only assignee of the rights of the assignor, but also assumes the duties of the assignor." For this proposition, the plaintiffs cite *Matter of 1616 Reminc Ltd. Partnership*, 9 Bankr. 679 (Bankr. E.D. Va. 1981), involving a claim by a subcontractor against an owner under a construction contract which had been assigned by the general contractor to the owner after the owner had knowledge of the subcontractor's claim. The assignment also took place after the owner had filed for bankruptcy and after a plan of arrangement had been confirmed. It was in this context, quite different from the situation here, that the bankruptcy court refused to follow what it termed the general rule that " 'an assignment of a contract does not operate to cast upon the assignee the duties and obligations or liabilities imposed by the contract on the assignor, in the absence of the assignee's assumption of such liabilities.' " *Id.* at 686 (quoting 6 Am. Jur. 2d *Assignments* § 109 (1964)).

The plaintiffs also cite this Court's decision in *Heating Corp. v. Dillon Sup. Co.*, 156 Va. 597, 159 S.E. 78 (1931), a case relied on by the bankruptcy court in *Reminc*. The *Heating Corp.* case involved an action in breach of warranty against a corporation for the refund of the price of water heaters purchased by the plaintiff on written contract. The contract, however, was not made with the corporation but with a partnership whose principals later formed the corporation, which then assumed the business of the partnership. Judgment in the trial court was for the plaintiff. We affirmed, stating that the evidence left "no reasonable doubt but that [the corporation] treated [the contract] as its own" and, therefore, that "there was ample evidence to warrant the jury in taking the view that the contract had been assumed by the defendant corporation." 156 Va. at 604-05, 159 S.E. at 80. The facts in *Heating Corp.* differ substantially from those here and, hence, the case is inapposite.

Also differing factually is another case cited by the plaintiffs, *Rose v. Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973). There, Rose leased a quarry to Dooley, who agreed to furnish stone to Rose at a fixed price for ten years. Vulcan purchased the quarry operation and the assets and obligations of Dooley. Vulcan

wrote Rose, informing him it had assumed Rose's contract and would carry out the contract's conditions. Later, Vulcan advised Rose it would no longer sell him stone at the price set forth in the Rose-Dooley contract. The Court held Rose was entitled to recover from Vulcan, stating that the Dooley-Vulcan contract was a general assignment of all the assets and obligations of Dooley and that when Vulcan accepted the assignment, "it . . . became delegatee of [Dooley's] duties . . . and impliedly promised to perform such duties." 282 N.C. at 663, 194 S.E.2d at 535.

While the foregoing authorities cited by the plaintiffs are distinguishable factually from the present case, an important legal difference also sets this case apart from the others. The plaintiffs' cases all involved normal *commercial* assignments or *general* assignments, while the present case involves an assignment for *security*, and we think this difference in nature requires a difference in result.

This view "bears strong parallels," in the words of *Citizens Suburban* v. *Rosemont*, to the declaration of Va. Code § 8.2-210(4):

> (4) An assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (*as in an assignment for security*) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract.

(Emphasis added.) The Official Comment states:

> 5. Subsection (4) lays down a general rule of construction distinguishing between a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties, and a financing assignment in which only the assignor's rights are transferred.

Two paragraphs of the loan agreement between the partnership and DMI demonstrate that what is involved here is a security assignment and not a commercial or general assignment. Paragraph 6 is styled "Security Agreement." In subparagraph

(a), the partnership, as borrower, grants to DMI, as lender, "a security interest in all contracts and/or Notes . . . ; provided, however, that Lender's security interest . . . shall be subject to (i) Borrower's power to collect the receivables and (ii) Borrower's rights to retain the payments unless Borrower is in default hereunder." Subparagraph (b) states that the "security interest created herein is given as additional security for the payment to the Lender of all indebtedness" due from borrower to lender.

In subparagraph (c) of Paragraph 6, the borrower is required to execute all financing and other statements to perfect lender's security interest. Subparagraph (d) provides that in the event of default, the lender may sell the contracts and notes, but any surplus remaining after lender's indebtedness is satisfied shall be paid to borrower.

Paragraph 52(c)(1) of the loan agreement grants lender a "first *conditional* assignment of all lot sales contracts and promissory notes." (Emphasis added.) Paragraph 52(c)(2) permits the lender in the event of default to reassign to borrower each contract and note lender has received as "additional security," in which case the borrower must pay the defaulted amount in cash or by the conditional assignment of other contracts and notes owned by borrower. And paragraph 52(c)(5) requires the lender to reassign all the contracts and notes to borrower upon payment in full of the outstanding balance of principal and interest.

Other provisions of the loan agreement make it clear that the partnership was obligated "to complete the improvements" in the subdivision, including roads, sewerage systems, and water systems, and that DMI had no responsibility for such installation. Furthermore, the plaintiffs make no allegation that DMI, by its actions or conduct, ever "assumed" or "treated . . . as its own," in the words of *Heating Corp.*, the obligation of installing the improvements in the subdivision. Accordingly, the trial court did not err in holding that DMI had not assumed the partnership's obligations to install roads, waterlines, and sewerage facilities.

The plaintiffs next contend that the trial court erred in holding that the promissory notes in question were negotiable. In this connection, the plaintiffs call our attention to the following clause in each of the notes:

> Should any default be made in payment of any installment of this note or in the performance of any of the covenants or

conditions of the deed of trust, . . . the entire unpaid amount hereof shall become due and payable forthwith at the election of the holder of this note and without notice.

The plaintiffs state that by "incorporating the terms of the deed of trust as requirements of the note and defining default as governed by the terms of the deed of trust, the note on its face clearly is made subject to or is governed by another agreement and thus is not an unconditional promise to pay." The result, the plaintiffs say, is to render the note nonnegotiable under Code §§ 8.3-104(1)(b) and -105(2)(a).

Section 8.3-104(1)(b) provides in pertinent part that to be negotiable, a document must "contain an unconditional promise or order to pay a sum certain in money and [must contain] no other promise, order, obligation or power given by the maker . . . ." Section 8.3-105(2)(a) provides that "[a] promise or order is not unconditional if the instrument . . . states that it is subject to or governed by any other agreement." The plaintiffs cite two of our recent decisions, handed down since this case was decided below. In *Salomonsky* v. *Kelly*, 232 Va. 261, 349 S.E.2d 358 (1986), the promissory notes there in question contained a provision saying they were " 'payable as set forth in that certain agreement dated March 15, 1976, an executed copy of which is attached hereto and made a part hereof by this reference.' " Citing Code §§ 8.3-104(1)(b) and -105(2)(a), we said "[t]his reference to another document for the payment terms of the notes makes the notes nonnegotiable." *Id.* at 263, 349 S.E.2d at 359.

In *Taylor* v. *Roeder*, 234 Va. 99, 360 S.E.2d 191 (1987), the promissory notes considered there provided for interest at 3% over Chase Manhattan Bank's prime rate, to be adjusted monthly. Citing *Salomonsky*, we said the notes were nonnegotiable because they suffered from "the disadvantage that the amount required to satisfy the debt cannot be ascertained without reference to an extrinsic source." *Id.* at 104, 360 S.E.2d at 194.[8]

The present case differs substantially from both *Salomonsky* and *Taylor*. The face of each note involved here shows with

---

[8] Code § 8.3-106 is cited in *Taylor* as authority for the holding quoted above. However, an amendment to this Code section, approved March 16, 1988, and made effective upon passage, now permits reference to the "established rate of a named financial institution" for ascertainment of the interest rate applicable to a particular instrument. Acts 1988, ch. 150.

exactness the amount payable, including interest, the number of installments required, and the amount of each installment. Reference to no other document is required to ascertain "the payment terms of the notes," *Salomonsky*, or "the amount required to satisfy the debt," *Taylor*.

Accordingly, we do not think that either Code § 8.3-104(1)(b) or § 8.3-105(2)(a) is implicated in this case. Rather, we think that the clause in question is merely an acceleration clause and, therefore, that Code § 8.3-105(1)(c) controls. It provides in part:

> § 8.3-105. *When promise or order unconditional.*
> (1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument
>
>  . . . .
>
> (c) refers to . . . a separate agreement or refers to a separate agreement for rights as to prepayment or acceleration[.]

Official Comment 3 to Code § 8.3-105 states in part:

> Inasmuch as rights as to prepayment or acceleration have to do with a 'speed-up' in payment and since notes frequently refer to separate agreements for a statement of these rights, such reference does not destroy negotiability even though it has mild aspects of incorporation by reference.

Official Comment 8 states in part:

> In the specific instance of rights as to prepayment or acceleration . . . , there may be a reference to a separate agreement without destroying negotiability.

Finally, the plaintiffs contend that the trial court erred in finding that DMI took the promissory notes in question without notice of claims or defenses. The plaintiffs cite Code § 8.3-304(1), which states that "[t]he purchaser [of an instrument] has notice of a claim or defense if . . . (b) the purchaser has notice that the obligation of any party is voidable in whole or in part." The plaintiffs then claim DMI accepted the notes with knowledge that they were given pursuant to executory contracts "and were voidable and subject to failure of consideration claims if title was not conveyed and if roads, water and sewer were not installed."

■ The trial court found that when DMI received the notes, no breach of the contracts had occurred and no defense had yet arisen. Consequently, the court said, DMI took the notes without notice of a defense.

The plaintiffs contend, however, that the court misconstrued Code § 8.3-304(4)(b), which states:

(4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim

. . . .

(b) that [the instrument] was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof[.]

The plaintiffs argue that the "of itself" language indicates Code § 8.3-304(4)(b) does not "provide an absolute shelter from executory claims which have not yet arisen." Holder in due course status can be denied, the plaintiffs maintain, "if there are other facts or circumstances which would create the knowledge necessary to make the claim voidable." This is made clear, the plaintiffs say, by the Virginia Comment to Code § 8.3-304, which states that under (1)(b), "the purchaser has notice of a defense if he has notice that the obligation of any party is voidable." The plaintiffs also point out that the Comment cites *Whaley Bros. v. Stevens*, 159 Va. 388, 165 S.E. 645 (1932), in which, the Comment states, "the status of due course holding was denied to a purchaser who took the instrument with full knowledge of the underlying contract and of the methods being followed by the payee in doing business."

■ But the underlying contract in *Whaley*, concerning which the instrument purchaser was charged with knowledge, contained a provision wherein the payee of the notes in question, a manufacturer, promised the maker, a merchant, that "[i]f [the merchant's] sales under this agreement do not amount to $480.00 [the manufacturer agrees] to either pay . . . the difference in cash or repurchase the goods purchased hereunder . . . ." 159 Va. at 390, 165 S.E. at 646. No language of similar import appears in the contracts involved in the present case. Hence, *Whaley* is inapposite, and we hold there is nothing in this case putting DMI on

"notice that the obligation of any party [was] voidable," within the meaning of the Virginia Comment to Code § 8.3-304.

█ We find no error in any of the rulings of the trial court in Record No. 841886. Accordingly, we will affirm the trial court's dismissal of DMI from the case. Although we find no error in any of the trial court's rulings in Record Nos. 841876 and 841884, further proceedings are necessary with respect to the defendants remaining in the case. Consequently, we will remand the matter for further proceedings consistent with the views expressed in this opinion.

> Record No. 841876 - *Remanded.*
> Record No. 841884 - *Remanded.*
> Record No. 841886 - *Affirmed.*