## HIGH KNOB ASSOCIATES, ET AL.

### V.

## JOCELYN F. DOUGLAS, ET AL.

Record No. 940815

April 21, 1995

Present: Carrico, C.J., Compton, Stephenson, Lacy, Hassell, Keenan, JJ.,
and Poff, Senior Justice

*George W. Johnston, III (Benjamin M. Butler; McKee & Butler; Kuykendall, Johnston, Coleman & Kuykendall*, on briefs), for appellants.

*Carter B. Foulds (Clifford L. Athey, Jr.; Law Offices of Edward F. Greco*, on brief), for appellees.

JUSTICE LACY delivered the opinion of the Court.

In this appeal, we consider whether the developers of a subdivision were required either by the Subdivided Land Sales Act of 1978 (SLSA), Code §§ 55-336 through 55-351, or by contract to

transfer title to the common facilities to the owners' association free of liens and encumbrances upon the sale of 75 percent of the subdivision lots.

In 1956, High Knob, Incorporated (HKI) began to develop High Knob, a subdivision in Warren County. The subdivision contains over 800 lots and numerous common facilities, including private roads, recreational facilities, a water system, and designated watershed or open space areas for the benefit of the lot owners.

In 1978, the General Assembly enacted the SLSA. The statute placed a number of requirements upon developers, including the mandatory transfer of the common facilities within a subdivision to the lot owners' association when 75 percent of the subdivision's lots are sold. Code § 55-344(A)(3). HKI, assuming that it was subject to this new law, made representations to prospective lot purchasers that it would, *inter alia*, transfer the common facilities to the owners' association upon sale or transfer of 75 percent of the lots, or upon the completion of all amenities and facilities, whichever occurred first. These representations appeared in Housing and Urban Development Statements (HUD Reports) given to prospective purchasers pursuant to the Interstate Land Sales Full Disclosure Act.[1] 15 U.S.C. §§ 1701-1720 (1982 & Supp. 1995).

HKI formed the High Knob Owners' Association, Incorporated, in 1978. The articles of incorporation and by-laws for the Association contained provisions regarding the conditions for transfer of the common facilities which were similar to those contained in the HUD Reports and the SLSA. These documents also stated that HKI would be the sole voting member of the Association as long as HKI retained an interest in any High Knob lots. Pursuant to these provisions, HKI exercised its sole voting right in November 1982 and amended the provision involving the transfer of the common areas. The amendment required that the transfer occur upon the sale or disposition of 95 percent of the lots, rather than the previous requirement of transfer when 75 percent of the lots were sold. Although notice of this change was not given to lot owners prior to the vote, the change appeared in corporate documents available to lot owners, and oral notice was given at Association meetings in 1983 and 1984.

---

[1] HUD Reports were filed by HKI in 1978, 1980, and 1981. Subsequent to 1981, HKI discontinued filing HUD Reports after discovering that High Knob qualified for an exemption from the Act.

In May 1992, a number of lot owners in the subdivision filed this declaratory judgment action against HKI.[2] The lot owners sought a declaration that, under either the SLSA or their lot purchase contracts, HKI was required to transfer the common facilities of the subdivision when 75 percent of the subdivision lots were sold and that HKI's attempt to raise the threshold for transfer to 95 percent was ineffective.[3] HKI filed its answer denying that it was precluded from altering the threshold for transfer of common facilities and filed a plea of the statute of limitations to the lot owners' contractual claims.

Following a hearing, the trial court found that: (1) HKI was subject to the SLSA; (2) the lot owners' action for breach of contract was not barred by the statute of limitations; (3) the HUD Reports were incorporated into two contracts for sale to plaintiff owners (Lawson and Douglas); (4) HKI's amendment to the by-laws to increase the threshold from 75 percent to 95 percent was void for failure to give notice to the lot owners prior to the vote; and (5) lots sold but reconveyed to the developers were not considered part of "lots sold or disposed of" for purposes of determining the 75 percent threshold transfer level. The trial court entered a judgment declaring that the common facilities of the High Knob subdivision must be transferred, free of liens and encumbrances, to the Association when 75 percent of the lots are sold or transferred.

HKI filed an appeal assigning error to each of the trial court's findings except that concerning the method of determining when lots are "sold or disposed of" for purposes of invoking the facilities transfer requirement. The lot owners, however, assigned cross-error to this finding. We awarded an appeal on all the assignments of error and cross-error and we will consider them in order.

---

[2] Effective January 1, 1990, HKI assigned all assets in High Knob subdivision to John K. Marlow and W. Allen Nicholls, trading as High Knob Associates. Marlow, Nicholls, and High Knob Associates were also named as defendants. All defendants are collectively referred to as "HKI."

[3] Prior to trial, a number of lot owners were added as plaintiffs and some plaintiffs took a voluntary non-suit. A total of six lot owners remained in the suit.

## I.

### Application of the SLSA

 The SLSA applies to any subdivision in which any of the lots are sold by a land sales installment contract. Code § 55-337(5)(a). The Act defines a land sales installment contract as:

> any installment contract for the sale or disposition of land whereby the purchaser does not receive a deed conveying the property purchased until part or all installment payments have been made as called for in the contract and record title to said property remains in another pending full performance of the contract.

Code § 55-337(11). Relying on the dictionary definition of "installment" and on the remedial nature of the SLSA, the trial court concluded that the Act applied to any contract which provided for payment of the purchase price in more than one payment. Because each of the contracts in this case provided for an initial payment at the time the contract for sale was executed and one or more subsequent payments for the balance of the purchase price, the trial court concluded that the contracts were installment contracts. Thus, the trial court held that the subdivision was subject to the SLSA. We disagree with this analysis, however, because it does not consider the entire definition of "land sales installment contract" and expands the coverage of the SLSA to land sales which do not share the potential for abuse which the General Assembly sought to remedy with the legislation.

The definition of "land sales installment contract" requires more than the use of installment payments. The definition also requires that "record title to said property remains in another pending full performance of the contract." Code § 55-337(11). The phrase "record title" is not defined in the SLSA. In the context of ownership of land, however, "record title" is generally used to describe ownership of a particular parcel of real property by the person in whose name title appears in the official deed records, in contrast to one who claims ownership through unrecorded documents. *BLACK'S LAW DICTIONARY* 1274 (6th ed. 1990). The

person with record title is the owner of the property with the power to encumber or transfer it.[4]

■ Applying these considerations to the five contracts relevant here, we conclude that the SLSA does not apply to High Knob.[5] Each contract provided for an initial payment ranging from $100 to $1,500 to be made at the time the contract for sale was signed. The contracts also required HKI to execute a general warranty deed to the purchasers within 30 days of the date that the sales contract was executed. In each case, HKI executed a general warranty deed and it was recorded, generally on the day of settlement or closing.

In the Cockrell, Kauffman, Peterson, and Lawson transactions, the buyers agreed to pay HKI the remainder of the purchase price in a series of 96 monthly installments beginning 30 days after settlement or closing on the lot sales. These contracts provided that the indebtedness was to be evidenced by promissory notes, secured by deeds of trust on the respective lots.

■ In these transactions, record title was transferred to each of the purchasers long before they completed performance on the sales contracts. Accordingly, these contracts do not come within the definition of a land sales installment contract contained in the SLSA and cannot be the basis for bringing the subdivision within the SLSA.

■ The final contract, the Douglas contract, was, with one exception, identical to the preceding four. The sole difference was that, after paying the initial deposit of $100 when the contract was signed, the remainder of the purchase price was paid to HKI in a single lump sum payment rather than in a series of installment payments. The deed was recorded on the same date the

---

[4] A deed of trust encumbering the property does not divest the purchaser of his status as record title holder. A deed of trust merely creates a lien on property to secure a debt. *Interstate R.R. Co. v. Roberts*, 127 Va. 688, 692, 105 S.E. 463, 464 (1920). The grantor retains his ability to deal with the encumbered property as its owner. *Lowry v. Gills*, 143 Va. 79, 129 S.E. 269 (1925); *Hale v. Horne*, 62 Va. (21 Gratt.) 112 (1871).

[5] The three other contracts in evidence are not relevant to this issue. Two contracts, the Ignegeri and Bardwell contracts, were executed prior to the enactment of the SLSA although the deeds were not transferred to the purchasers until after the effective date of the Act. The statute cannot be held to have retroactive effect unless there was clear legislative intent to do so and no such intent exists here. *See Virginia Farm Bureau Insurance Co. v. Travelers Indemnity Co.*, 242 Va. 203, 208, 408 S.E.2d 898, 901 (1991).

The third contract, the Lazear contract, was for the sale of improved property, which is exempt from the SLSA.

lump sum payment was made, in this case only 15 days after the first payment was made and the contract for sale was executed.

Under the trial court's interpretation of the statutory definition, the Douglas transaction qualifies as a land sales installment contract because it involved two payments. However, we decline to adopt the trial court's rationale and conclusion. To extend the definition of land sales installment contract to the two-payment Douglas transaction provides no remedy for the abuses sought to be addressed by the SLSA and strains the meaning of "installment" by applying it to a transaction comprised of only a deposit and subsequent payment in full. This is not the type of land sales contract which prompted the passage of the SLSA.

The SLSA was enacted following a study and report issued pursuant to a 1977 Joint Resolution of the General Assembly. In the study commission's report, land sales installment contracts were described as purchase contracts which "at best, . . . provide the purchaser only with an equitable interest in the land during the period prior to transfer of title." Real Estate Commission, Report on Recreational Land Development to the Governor and the General Assembly of Virginia, H. Doc. 5, Vol. II, at 6 (1978). The abuses accompanying this type of land purchase contract included committing the buyer to many obligations, including the payment obligation, but committing the seller only to providing a deed when all payments were made. In addition, the buyer's interest could be defeated by the developer's "mortgagees or creditors and by mechanics and subcontractors" and the liquidated damages clauses universally applicable in the event of the buyer's default allowed the developer "to retain all sums paid by the purchaser as agreed upon liquidated damages." *Id.* Under such contracts, the purchaser might pay the developer for years, miss a single payment, and retain neither the land nor the value of his payments.[6]

If, however, the buyer has record title, he is not subjected to the risks just described. If the buyer defaults, sale of the property may be forced by the beneficiary of a deed of trust or by enforcement of a judgment obtained against the buyer for the unpaid amounts. The buyer does not lose the land or the value of payments made, however, because any amount recovered above the unpaid balance of the indebtedness is credited to the buyer. Therefore, it is record

---

[6] The legislation proposed in the report did not contain a definition of "land sales installment contract;" as passed, however, the definition was included and the SLSA was limited to those transactions.

title and the attendant attributes of ownership, not the use of installment payments, which distinguishes those land sales transactions which need the protection of the SLSA from those that do not.

 In the Douglas contract and others like it, the protection of the SLSA is not needed. The initial payment is for a relatively small amount, in this case $100. No other payments are made between the initial deposit and the final payment. Consequently, there is no opportunity to suffer the loss of the land or the value of the payments paid because of a default. Therefore, we hold that a land sales contract consisting solely of an initial down payment or deposit and a second final payment for the full purchase price is not a land sales installment contract as defined by the SLSA. Accordingly, we will reverse the judgment of the trial court holding that High Knob is subject to the SLSA.

We next consider HKI's contention that the trial court erred in holding that the HUD Reports are incorporated into the Lawson and Douglas contracts, imposing enforceable contractual obligations on HKI.

## II.

### Contract Claims

#### A. Statute of Limitations

Initially, we address HKI's contention that the lot owners' contractual claims are barred by the statute of limitations. HKI asserts that the breach of the alleged contracts occurred either in 1982, when HKI amended the Association by-laws to increase the threshold of sales from 75 percent to 95 percent, or in 1984, the date on which notice of the change was given to the lot owners. Under either theory, HKI argues, this action was brought beyond the five-year statute of limitations period for written contracts. We disagree.

 It is well-settled that the statute of limitations runs from the time of actual performance and not the time of the anticipatory repudiation:

> Since on the happening of an anticipatory breach the promisee has the right, according to practically all the authorities, to await the time for performance and bring suit when that time has arrived, the statute of limitation . . .

does not begin to run until the time for performance fixed by the terms of the contract.

*Simpson v. Scott*, 189 Va. 392, 398, 53 S.E.2d 21, 24 (1949). *See also Heirs of Roberts v. Coal Processing Corp.*, 235 Va. 556, 369 S.E.2d 188 (1988). In the present case, the alleged contract fixes the time for performance at the point when 75 percent of the High Knob lots are sold or transferred. Both parties agree that this 75 percent threshold has not yet been met; consequently, the time for performance has not occurred. The statute of limitations will not begin to run until the time for performance has passed. Therefore, the trial court correctly denied HKI's plea in bar based on the statute of limitations.

### B. Incorporation of the HUD Reports

Lot owners Lawson and Douglas maintain that the HUD Reports they received from HKI at the time they purchased their lots were part of their sales contracts with HKI. The lot owners contend that, even if the SLSA did not apply to the subdivision, provisions contained in the HUD Reports required HKI to transfer the common facilities to the Association when the 75 percent threshold sales level was reached.[7] We conclude that the trial court did not err in holding that the HUD Reports were incorporated into the Lawson and Douglas contracts.

In *Marriott v. Harris*, 235 Va. 199, 214-15, 368 S.E.2d 225, 232-33 (1988), we held that a HUD property report was incorporated into a contract for sale by language in the contract referring

---

[7] The HUD Reports stated in relevant part:

An Owner's Association has been formed and the recreational facilities will be transferred by us to the Owner's Association no later than at such time as we transfer legal or equitable ownership of at least 75 percent of the lots within the subdivision to purchasers of such lots or all the amenities and facilities (including roads and the initial water system) are completed, whichever shall first occur. The facilities to be transferred to the Owner's Association and those to be retained by us (principally the manager's residence, offices and storage) are described in the Owner's Association By-Laws and Declaration. All recreational facilities will be transferred to the Owner's Association, free and clear of encumbrances.

. . . .

Title to the developer-owned water system will be transferred to the Owner's Association no later than at such time as the developer transfers legal or equitable ownership of at least 75% of the lots . . . to purchasers . . . or when all of the common amenities and facilities . . . are completed, whichever should first occur.

to the report, although specific words of incorporation were not used.[8] Furthermore, incorporation was not defeated by a clause in the contract stating that the contract "represented the entire agreement" between the parties because, if the report is deemed incorporated into a contract, then the report is part of the "entire" contract protected by just such a clause. *Id.* at 214 n.6, 368 S.E.2d at 232 n.6. *Marriott* is dispositive here.

The contracts HKI executed with Douglas and Lawson contained the following language referring to the HUD Reports:

YOU HAVE THE OPTION TO VOID YOUR CONTRACT OR AGREEMENT BY NOTICE TO THE SELLER IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION . . . IN ADVANCE OF, OR AT THE TIME OF YOUR SIGNING THE CONTRACT OR AGREEMENT. IF YOU RECEIVED THE PROPERTY REPORT LESS THAN 48 HOURS PRIOR TO SIGNING THE CONTRACT OR AGREEMENT YOU HAVE THE RIGHT TO REVOKE . . . BY NOTICE TO THE SELLER UNTIL MIDNIGHT ON THE THIRD BUSINESS DAY FOLLOWING THE CONSUMMATION OF THE TRANSACTION.

There is no substantive difference between the language referring to the HUD Reports in this case and the language considered sufficient in *Marriott* to incorporate the report into the contract for sale. In this case, the representations made in the HUD Reports were incorporated into the contracts of sale, were part of the bargained-for exchange, and were collateral terms of the sale not inconsistent with the deeds. *See Carstensen v. Chrisland Corp.*, 247 Va. 433, 440, 442 S.E.2d 660, 664 (1994); *Miller v. Reynolds*, 216 Va. 852, 855, 223 S.E.2d 883, 885 (1976).[9] The trial court,

---

[8] The pertinent contract language in *Marriott* read, "Purchaser . . . hereby acknowledges receipt of a property report prepared pursuant to the Interstate Land Sales Full Disclosure Act, that he has read and understands such report . . . ." *Marriott*, 235 Va. at 214, 368 S.E.2d at 232.

[9] HKI argues that, even if a contract exists, it should be rescinded because of mistake. HKI claims that both parties believed that the SLSA governed High Knob, and that because of this mistaken belief, HKI made these promises within the HUD Reports. The mistake set forth is one of law. The general rule is that mistake of law is never a ground for

therefore, correctly held that HKI has a contractual obligation to comply with the provisions contained in the HUD Reports.[10]

## C. Unencumbered Transfer of Common Areas

HKI also assigns error to the trial court's determination that the common facilities are to be conveyed free of liens and encumbrances.[11] In its brief, HKI supports this proposition by a single statement that it has no contractual obligation to do so. We disagree.

The HUD Reports unequivocally stated that "[a]ll recreational facilities will be transferred to the Owner's Association, *free and clear of encumbrances*" (emphasis added). This representation is a contractual obligation of HKI. However, a similar representation is not made with regard to other components of the common facilities such as the water system, the roads, or watershed areas. Therefore, we conclude that HKI is contractually obligated to transfer the recreational facilities without liens and encumbrances, but this obligation does not extend to the other common facilities.

## D. Lienholder as Necessary Party

Finally, HKI asserts that the trial court did not have jurisdiction to resolve the issues before it because a necessary party, the holder of a blanket lien on the subdivision property, was not a party to the action. In 1990 High Knob Associates, assignee of

rescission unless the other party knowingly has taken advantage of such ignorance for fraud. *Broaddus v. Broaddus*, 144 Va. 727, 746, 130 S.E.2d 794, 800 (1925). Additionally, if all facts necessary to form a correct conclusion of law are known, then no relief will be granted due to mistake of law, even if it were a mutual mistake on the part of both parties. *Piedmont Trust Bank v. The Aetna*, 210 Va. 396, 400-01, 171 S.E.2d 264, 267-68 (1969). No allegations or facts have been presented to establish that the lot owners have taken advantage of HKI's mistake of law, or that all facts necessary to draw a correct conclusion were not known.

[10] We need not address HKI's contention that the trial court erred in holding that HKI's amendment of the Association by-laws was void for lack of notice to the members. A basic principle of contract law is that contractual obligations cannot be unilaterally altered. Any action taken regarding the transfer provision in the by-laws of the Association cannot affect the obligations imposed by contract.

[11] The trial court's decision was based on its finding that the subdivision was subject to the SLSA. While we need not address the statutory requirements in light of our earlier holding that the Act was not applicable here, we do consider the lot owners' assertion that they have a contractual right to an unencumbered transfer of the common areas.

HKI's assets, borrowed $1.6 million and executed a three-year renewable Loan and Security Agreement and Purchase Money Deed of Trust in favor of the lender. The listed security for the loan included the unsold lots in the subdivision, the common areas, and other personalty. At trial, HKI asserted that the decision of the court could adversely affect the rights of the lienholder and, therefore, the lienholder was a necessary party. We disagree.

Unlike the mechanics' liens enforcement actions relied on by HKI, this is an action seeking only a declaratory judgment. The time for conveyance of the common facilities with or without liens has not yet occurred. In the absence of any conveyance, there is no adverse impact on the present security interests of the lienholder and nothing in this litigation impairs High Knob Associates' obligation to the lienholder. Indeed, the debt may not even exist when the common facilities are ultimately conveyed. Accordingly, the lienholder was not a necessary party under these circumstances.

### III.

### Cross-error

The lot owners assert that the trial court erred in holding that the "developer will be deemed to have sold 75% of the lots in the subdivision when there are fewer than 202 of the original lots in the developer's inventory, without regard to whether the lots have been previously sold to non-developer purchasers and reacquired by the developer." The lot owners argue that this interpretation effectively permits HKI to indefinitely avoid reaching the 75 percent threshold. HKI, they contend, could cycle lots in and out of their inventory indefinitely. We agree.

The contracts require transfer of ownership to the Association at the time HKI "transfers legal or equitable ownership of at least 75% of the lots." This requirement does not involve any consideration of the number of lots remaining in HKI's inventory. The plain reading of the provision is that transfer of ownership, or sale, of the lot is all that is required, regardless of any subsequent disposition of the lot. Furthermore, if the trial court's decision is applied, HKI could avoid transfer of the common areas by reacquisition of lots. The restrictive covenants, the contracts for sale, and the declaration of the Association, provide that HKI retains a right of first refusal. Under these provisions, lot owners who wish

to sell their lots are required to offer the lots to HKI "at the same price and upon the same terms and conditions as set forth in such executed written contract of sale" received from a prospective purchaser. Exercising this right of first refusal could allow HKI to maintain an inventory of 202 lots indefinitely and thereby avoid transfer of common facilities.

Accordingly, we conclude that calculation of the 75 percent transfer threshold is to be based on the initial transfer of legal or equitable ownership to a purchaser, regardless of any further disposition of the lots.

In summary, we hold that: (1) the SLSA is not applicable to High Knob; (2) the HUD Reports were incorporated into the Lawson and Douglas contracts and HKI is contractually obligated to comply with the conditions contained therein; specifically, HKI must transfer the common facilities of the subdivision to the Association when legal or equitable ownership of 75 percent of the lots has been transferred to purchasers or when the common facilities are completed, whichever occurs first; (3) the recreational facilities must be transferred to the Association free of liens and encumbrances; and (4) calculation of the 75 percent transfer threshold is based on the initial transfer of legal or equitable ownership to a purchaser regardless of any subsequent repurchase or reacquisition by HKI. Accordingly, we will vacate those portions of the trial court's judgment inconsistent with these holdings and affirm the remainder of the judgment.

*Affirmed in part,*
*vacated in part,*
*and final judgment.*