# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

UPSHUR T. MEARS v. ACCOMAC BANKING COMPANY, INC., ET AL.

April 7, 1933.

Present, All the Justices.

The opinion states the case.

*Mapp & Mapp* and *Herbert Barnes,* for the plaintiff in error.

*James E. Heath* and *Stewart K. Powell,* for the defendants in error.

CHINN, J., delivered the opinion of the court.

This is an action brought by Upshur T. Mears, herein referred to as plaintiff, against the Accomac Banking Company, Incorporated, J. Merritt Chandler, cashier of said bank, and J. Merritt Chandler, individually, herein referred to as defendants, to recover damages for fraud and deceit.

The original declaration was demurred to by the defendants on the ground that it blended an action of tort with an action *ex contractu.* The demurrer was sustained with leave to the plaintiff to file an amended declaration, which was done. The amended declaration was then demurred to on the same ground, which demurrer was also sustained by the court, whereupon plaintiff asked leave to file a second amended declaration, which leave was granted upon condition that the plaintiff pay the costs which had accrued up to the date of the order sustaining the last mentioned demurrer. This action of the court is assigned as error.

It appears that the plaintiff filed his second amended declaration in accordance with the leave granted by the court and was allowed to develop his case thereunder as fully and completely as he could have done under the first amended declaration.

Practically the same situation arose in the case of *Forbes & Co.* v. *Southern Cotton Oil Co.,* 130 Va. 245, 108 S. E. 15, 16. In that case the plaintiff filed an original and also an amended declaration to both of which the court sustained a demurrer, and the plaintiff by leave of the court filed a second amended declaration, a demurrer to which was overruled. The court said: "The plaintiff was permitted to prove its whole case under the second amended declaration, but, having excepted to the ruling of the trial court sustaining the demurrer to the original and first

amended declarations, as provided by section 6116 of the Code, it insists that we shall pass upon the sufficiency of the original and amended declarations. If there was error in sustaining the demurrer thereto it was harmless, and the question presented is moot. The statute was not intended to apply to such a case. This court does not undertake to correct harmless errors."

After the conclusion of the plaintiff's evidence, the defendants, without introducing any evidence, moved the court to strike out all the evidence adduced by the plaintiff, on the ground "that said evidence did not make out a sufficient case to justify a verdict in favor of the plaintiff against either of said defendants, and upon the further ground that the evidence showed that any loss sustained by the plaintiff was the result of breach of contract and not by misrepresentations in tort." This motion was sustained by the court, which thereupon instructed the jury "that all the said evidence had been stricken from the record, and that there was nothing left for them to do but find for the defendants." The jury returned a verdict as thus instructed by the court, upon which verdict judgment was entered.

The plaintiff assigns as error: (1) The action of the court in striking out the plaintiff's evidence and directing a verdict in favor of the defendants; and (2) the entry of final judgment for the defendants. These assignments covering the same point will be considered together.

■■ In *Green* v. *Smith*, 153 Va. 675, 151 S. E. 282, 283, Mr. Justice Epes, speaking for the court, said: "A motion to strike out all the evidence of the adverse party is very far-reaching and should never be entertained where it does not plainly appear that the trial court would be compelled to set aside any verdict for the party whose evidence it is sought to strike out. * * * In considering a motion to strike out all the plaintiff's evidence, the evidence is to be considered very much as on a demurrer to the evidence. All inferences which a jury might fairly draw from plaintiff's evidence must be drawn in his favor; and where there

are several inferences which may be drawn from the evidence, though they may differ in degree of probability, the court must adopt those most favorable to the party whose evidence it is sought to have struck out, unless they be strained, forced, or contrary to reason. *Dove Co.* v. *New River Coal Co.,* 150 Va. 796, 143 S. E. 317; *Limbaugh* v. *Commonwealth,* 149 Va. 393, 140 S. E. 133, 135; *Goshen Furnace Corp.* v. *Tolley's Adm'r,* 134 Va. 404, 114 S. E. 728."

Viewed in the light of these rules the evidence introduced by the plaintiff, so far as necessary to determine the question presented, may be stated as follows:

Plaintiff was an unlettered farmer residing near the town of Parksley, where the defendant bank is located, and at the time the transaction involved occurred had been dealing with the defendant bank through its cashier, J. Merritt Chandler, in whom the plaintiff had great confidence and trust, for a number of years. In January, 1922, plaintiff had on deposit in the bank the sum of $3,000 which the bank, through Mr. Chandler, invested for the plaintiff in a local farm mortgage, but the plaintiff never saw or received the security representing the loan, the bank retaining the same in its possession and merely giving the plaintiff a receipt therefor. The bank collected this loan on December 1, 1923, depositing the principal and accumulated interest, amounting to $3,165, to plaintiff's credit. Desiring to reinvest this money, plaintiff, after consultation with his brother-in-law, decided to turn it over for that purpose to Mr. Warner Ames, a prominent and responsible attorney of Accomac county, who, he was informed, made a practice of lending money for his clients and guaranteed the safety of such investments. On December 15, 1923, plaintiff went to Parksley for the purpose of withdrawing his money from the bank and intrusting it to Mr. Ames to invest for him. While on his way to the bank, plaintiff happened to meet on the street Mr. Sylvanus Parks, vice-president, and one of the directors of the bank, also well known to the plaintiff,

and informed Mr. Parks what he proposed to do. Mr. Parks thereupon told the plaintiff: "Upshur, the Accomac Banking Company can lend your money out as safe as Warner Ames. * * * You have always been dealing with the Accomac Banking Company. * * * Whenever the Accomac Banking Company lends your money out and handles it in any way, you have two chances. If they put it on bad property, they pay you. * * * You go and see Mr. Chandler." Plaintiff thereupon entered the bank and told Chandler, the cashier, about his conversation with Parks, whereupon Chandler said: "Sure, the Accomac Banking Company can lend it as good as Warner Ames. Whenever they lend it out they are behind it. * * * Naturally, their guarantee is as good as Warner Ames."

Relying upon these assurances on the part of the officials of the defendant bank, plaintiff signed a check drawn by the cashier, payable to the Accomac Banking Company, for the sum of $3,021.33, for which he received the following receipt:

"Mr. Upshur T. Mears, Accomac Banking Company. We enter for collection $3,000 Larchmont bonds. (Signed) Yours very truly, J. Merritt Chandler, Cashier."

Plaintiff further testified that at the time the aforesaid check was signed and the above receipt given him Chandler stated to him that the "Accomac Banking Company had these bonds there," that "they are as good as gold," and that the $21.33 was to cover the interest on said bonds which he (the plaintiff) owed the said Banking Company; that up to the time of said transaction the plaintiff had never heard of Larchmont bonds, knew nothing whatever about them, and did not see the bonds for which he gave the bank his check and received the aforesaid receipt. Upon returning home with his receipt and telling his wife what had happened, plaintiff found she was greatly dissatisfied that he had not drawn his money out of the bank and turned it over to Mr. Ames as originally planned. As a result of her dissatisfaction plaintiff returned to the bank the follow-

ing day, explained to Chandler that his wife was dissatisfied, and was told by Chandler that "the bank would pay me my money any time I wanted it." "You tell your wife not to see one minute's uneasiness about your money. It is safe." "You tell her you are dealing with the Accomac Banking Company and it is just as good as gold;" and "these bonds are all right because Mr. Harry Rew was the man who interceded for them for the bank and he taken them and you know they are all right."

Mr. Rew was at the time and now is attorney for the defendant bank, one of its directors, and also a prominent attorney and citizen, whom the plaintiff had known for a great many years and in whom he had great faith and confidence. Thus reassured as to the safety of the bonds in which the defendant bank had invested his money, plaintiff retained the receipt given by the bank without further question, and was regularly paid the semi-annual interest on $3,000 by the defendant bank until August, 1929, without ever having seen the bonds in which his money was supposed to have been invested and to be in the bank's possession, until some time in July, 1929, when he was informed by a man named Bond that there was some trouble with the defendant banking company about bonds. Plaintiff then took his receipt to Mr. Parks, vice-president of the bank, and asked him where his money was. Mr. Parks told plaintiff to go in the bank and see Mr. Chandler about it. Plaintiff then went to Chandler, who told him that his money "was in Norfolk but was safe;" that the talk he had heard did not amount to anything, and to pay no attention to it. The defendant bank failing to pay the installment of interest due on August 15, 1929, plaintiff then went to see Dr. John W. Bowdoin, president of the defendant bank, in regard to the matter. Dr. Bowdoin told him the bank had "$18,000 to $35,000 of those bonds," and "if the bank has lost that I expect it has lost enough."

Both the defendant bank and Chandler refusing to assume any liability for plaintiff's money, either principal or

interest, he then employed counsel, and on May 20, 1930, delivered the original receipt of December 10, 1923, and was thereupon given by Chandler, cashier of the defendant bank, two coupon bonds numbered 218 and 219, of "Larchmont Investment Corporation," for $500 each, dated August 15, 1927, and four coupon bonds, numbered 110, 111, 112 and 113, of "Larchmont Realty Corporation," for $500 each, dated November 30, 1927. It is evident that these bonds were not in existence December 10, 1923, and could not have been the same "$3,000 Larchmont bonds," which the defendants then represented as being in the possession of the bank, and for which it gave the plaintiff a receipt.

After getting these six bonds, plaintiff, through his counsel, forced a sale of the "Larchmont" property under the deeds of trust securing the bonds, which deeds of trust were dated August 15, 1927, and November 30, 1927, respectively. The deed of trust from the Larchmont Investment Corporation secured a bond issue of $110,000. The net amount realized from the sale of the lots embraced in this deed of trust was $376. The deed of trust from the Larchmont Realty Corporation secured a bond issue of $75,000. The net amount realized from the sale of the lots embraced in that deed of trust was $414. The bonds turned over to the plaintiff on May 20, 1930, proved, therefore, to be practically worthless.

The evidence discloses that both of the above mentioned corporations were organized and controlled by a firm of real estate speculators or promotors known as Bellamy & Hough, of Norfolk, Va., neither of whom was in 1923, or at any time since then, financially responsible for any amount; that on August 16, 1923, these parties caused to be issued by the said Investment Corporation coupon bonds aggregating the sum of $110,000, and on November 30, 1923, caused to be issued by the Larchmont Realty Corporation coupon bonds aggregating the sum of $60,000, but neither of these bond issues was secured by deed of trust or otherwise, except by their own worthless endorsement, until the deeds

of trust of August 15, 1927, and November 30, 1927, respectively, hereinbefore mentioned, were executed and recorded, when the bonds of the original issue of $110,000 of Larchmont Investment Corporation were exchanged for the new issue of like amount secured by the deed of trust of August 15, 1927, and the old issue of $60,000 of Larchmont Realty Corporation exchanged for a new issue of $75,000 of the bonds of that corporation, secured under the deed of trust of November 30, 1927. The evidence further shows that on August 27, 1923, thirty of the $500 bonds included in the above issues were sent to the defendant banking company, as collateral security for a loan of $15,000 made by said bank to the Larchmont Realty Corporation, which loan, at the time of the trial of the case, had been reduced to $13,000; and that when the defendant bank was examined by the State Bank Examiner on September 10, 1923, the bank owned and held among its assets $5,500 of said bonds. The evidence further shows that with the exception of the bonds so held by the defendant banking company, all the bonds issued by the Larchmont Realty Corporation and the Larchmont Investment Corporation, from August 16, 1923, until November 30, 1927, came to the defendant, Chandler, and Mr. J. Harry Rew, attorney for and director of the defendant bank.

As to the manner in which the lots owned by the two corporations were handled and manipulated by Bellamy & Hough, the evidence is not clear, but it tends to show that many of the lots were unsalable on account of their form and location, and between the time the first bonds were issued in 1923 and the deeds of trust securing the substituted issues were recorded in 1927, many of the more desirable and most valuable of the lots had been sold, and in consequence the value of the properties involved was thereby greatly reduced; that no taxes had been paid on the lots embraced in the deeds of trust for several years prior to 1927, when the deeds were recorded; and between 1923 and 1927 intervening deeds of trust had been recorded against

some of the lots upon which the two bond issues of the year last mentioned were secured.

Considering the foregoing evidence and all just and proper inferences which may have been drawn therefrom by the jury, we think the learned judge of the trial court was in error in striking out the plaintiff's evidence and instructing the jury as he did.

The law is well settled that if one represents as true what is really false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on; and he to whom the representation is made, believing it to be true, acts on it, and in consequence thereof sustains damage, there is such fraud as will support an action for deceit at law, or a bill for rescission of the transaction in equity. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual. *Trust Co.* v. *Fletcher,* 152 Va. 868, 148 S. E. 785, 73 A. L. R. 1111; *Moore* v. *Gregory,* 146 Va. 504, 131 S. E. 692; *Lowe* v. *Trundle,* 78 Va. 65; *Jordan* v. *Walker,* 115 Va. 109, 78 S. E. 643; *Grim* v. *Byrd,* 32 Gratt. (73 Va.) 300; *Guarantee Co.* v. *First Nat. Bank,* 95 Va. 480, 28 S. E. 909.

"Where one, who is reasonably expected to know, makes a positive representation of a material fact, when he is ignorant whether the fact is true or untrue, and it turns out to be untrue, causing damage to another who in good faith relied upon the representation as true, the injured party is entitled to relief." *Strickland* v. *Cantonwine,* 140 Va. 193, 124 S. E. 292, 298. And it was held in the same case that where the parties are not on an equal footing with reference to the subject of the transaction (as where one of them has or is presumed to have means of information not equally open to the other), and the party to whom the false representations are made is induced to enter into the contract by reliance on the truth of such representations, such representations, even though of matters of opinion as to the value of property and the like, will be regarded as

fraudulent, and afford the injured party good ground for relief.

It is argued by counsel for defendants in their brief that the plaintiff's testimony shows he relied upon a promise and not upon any statement of fact made to him by Chandler as to the value of the bonds. This contention is based upon the answer made by the plaintiff to certain questions propounded by accomplished and astute counsel for the defendants on cross-examination, wherein plaintiff stated that he relied on Chandler's statement that the bank would *guarantee* the bonds. While it is true the plaintiff made this statement, it also appears that he frequently stated, both on direct and cross-examination, that he agreed to buy the bonds in question, "Because he (Chandler) told me the bank had them there, and they were good as gold, and anything the bank sold to me they stood behind;" that "he told me all the time I was dealing with the bank;" and "if the bank takes them they must be good because Mr. Harry Rew interceded for them and took them for the bank."

Even though, however, defendants were right in their contention as to the evidence, as said by the late Chief Justice Prentis, in *Lloyd* v. *Smith,* 150 Va. 132, 142 S. E. 363, 366, "when, through inducements held out by one person, even only by means of a promise by which another person is influenced to change his position so that he cannot be placed *in statu quo,* and will be seriously damaged unless the promise is fulfilled, then the refusal to perform is fraud."

It is also contended by the defendants that the trial court properly struck out the evidence because the plaintiff, when required to do so by the court, elected to rely upon the misrepresentations made to him by the defendants when he purchased the bonds in December, 1923, and that plaintiff's right of action was, therefore, barred by the five years statute of limitations. (*Trust Co.* v. *Fletcher,* 152 Va. 868, 148 S. E. 785, 73 A. L. R. 1111.)

Section 5811 of the Code of 1919 provides in part as follows: "The right to recover money paid under fraud or mistake shall be deemed to accrue, both at law and in equity, at the time such fraud or mistake is discovered, or by the exercise of due diligence ought to have been discovered."

The evidence clearly shows that the interest on the bonds was regularly paid by the defendants from the time they were purchased by the plaintiff in December, 1923, until August, 1929, and up to that time the plaintiff had no reason to suspect that they were worthless, or to make inquiry in regard to them. On the other hand, the conduct of the defendants concealed the true status of the bonds from the plaintiff, and he had every reason to believe, until default was made in the payment of interest and the transaction was repudiated by the defendants in 1929, that his money was safely invested, as represented to him by the defendants at the time he was induced to turn it over to them for that purpose.

We do not think, therefore, that the plaintiff's claim is barred by the statute of limitations because of lack of diligence on his part to discover the fraud.

For the foregoing reasons, we are of opinion that the judgment of the trial court must be reversed, and the case remanded for a new trial to be had therein not inconsistent with the views herein expressed.

*Reversed and remanded.*

EPES, J., dissenting:

To make clear the grounds of my dissent would require a restatement of the evidence, which I have neither the time nor inclination to make, but I think it proper that I should indicate the points of my dissent. They are as follows:

(1) While the plaintiff in error may have a cause of action for breach of contract, or for the conversion of the bonds purchased by him in 1923, the evidence is, I think, insufficient to support a verdict finding the defendants in

error guilty of actual or constructive fraud in 1923 in selling to the plaintiff the bonds sold him in 1923.

(2) While the language used in the cases cited in the opinion on the point of constructive fraud may have been applicable to the particular facts of the cases in which the language was used, they are too broad as a general statement of the law.

I think the judgment of the trial court should be affirmed.