## CIRCUIT COURT OF WARREN COUNTY

Josh Douglas et al.

v.

HKA et al.

October 21, 1993

Case No. (Chancery) 92–70

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court for trial on October 13, 1993, on the Plaintiffs' Declaratory Judgment Action to determine the rights of certain lot owners in a large, residential subdivision. The parties appeared in person with their counsel: Carter B. Foulds, Esq., for the Plaintiffs; Benjamin M. Butler, Esq., for Defendants, Marlow, Nichols, and High Knob Associates; and George W. Johnston, III, Esq., for the Defendant, High Knob, Inc. Prior to the beginning of the trial, certain plaintiffs nonsuited their cases, and the remaining plaintiffs nonsuited their right of action based on oppressive corporate conduct of the defendants. The prefiled exhibits and the depositions of Bardwell, the Douglases, Lawson, Lazear, Morgan, and Peterson, were admitted into evidence. The proposed findings of fact submitted by each party were reviewed, and nearly all the material facts were admitted by the parties. The Defendants were given until October 19, 1993, to file a response to the Plaintiffs' trial brief, which has been filed. Upon consideration of the facts and the memoranda and argument of counsel, the court has made the following decision.

### I. *Findings of Fact*

The following facts have either been admitted by the parties or are found by the greater weight of the evidence.

High Knob Subdivision, hereinafter called "High Knob," is a development of more than 800 lots in Warren County, Virginia. High Knob contains a system of private roads, recreational facilities, water treatment and distribution facilities, and designated watershed or open space for the benefit of the lot owners at High Knob, which are hereinafter collectively referred to as "the common facilities."

The plaintiffs are owners of lots within High Knob.

Defendant High Knob, Inc., hereinafter called "HKI," is a Virginia corporation, which was the original developer of High Knob Subdivision. Defendant HKA, hereinafter called "HKA," is a partnership doing business in Warren County and is the successor by purchase of HKI. Plaintiff's Exhibit 26.

Defendants Marlow and Nichols are the general partners of HKA.

HKA is the current Developer insofar as the High Knob Owners Association and the ownership of the common facilities is concerned.

The plaintiffs are all members of the High Knob Owners Association, Inc., a Virginia corporation, which was formed by HKI in 1978.

After July 1, 1978, High Knob was a subdivision of land into one hundred or more lots wherein lots were sold pursuant to a common promotional plan and where lot purchasers have the use of common facilities within the subdivision, for which use the lot owners are assessed fees.

HKI registered High Knob with the Department of Housing and Urban Development under the Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1701 *et seq.*) (Plaintiff Exhibits 1, 2, 5 and 6); and with the Virginia Real Estate Commission pursuant to the Virginia Subdivided Land Sales Act (§ 55–336, *et seq.* of the Code) (Plaintiff Exhibit 3).

HUD "Property Reports" were distributed to some prospective purchasers in the course of the sale of High Knob lots, including Douglas (1978 Report) (Plaintiff Exhibit 2A) and Lawson (1980 Report) (Plaintiff Exhibit 5). In addition, HKI prepared and filed a 1981 Property Report.

The property reports filed by HKI and the corporate documents of the Home Owners' Association originally provided that the title and control of the common facilities at High Knob would be transferred to the Owners Association upon the earlier occurring of two occurrences:

a. 100% completion of the common facilities; or

b. Sale or conveyance of 75% of the lots platted in the High Knob Subdivision.

See the 1978 Report, Plaintiff Exhibit 2, p. 25; Plaintiff Exhibit 2A, p. 8; and the 1980 report, pp. 20–21, Plaintiff Exhibit 5.

The 1980 and 1981 Property Reports filed by HKI also provided that the title and control of the common facilities at High Knob would be transferred to the Owners Association upon the earlier occurring of two occurrences:

a. 100% completion of the common facilities; or

b. Sale or conveyance of 75% of the lots platted in the High Knob Subdivision.

Prior to July 1, 1978, HKI routinely sold lots at High Knob using land sales contracts. In some cases, those contracts were not completed and deeds conveyed until after July 1, 1978. HKI entered into a contract with Ingegneri, dated May 5, 1978 (Plaintiff Exhibit 8), for sale and purchase of certain property on High Knob. The deed to the property was not delivered to the purchaser until after July 1, 1978. The Ingegneri contract provided that the lots had been sold for twenty thousand dollars "of which $2,000 have been paid at the signing of this agreement . . . Purchaser . . . agrees to pay the balance in monthly installments of . . . $188.95 each, commencing on 1 July and continuing monthly thereafter until said entire balance shall have been paid . . . ."

HKI made a contract with Cockerell dated June 12, 1980 (Plaintiff Exhibit 10) for sale and purchase of certain property on High Knob. This contract provided for a down payment of $1,000.00, and the Cockerells "agree to pay for the lots in 96 monthly installments of $156.34 . . . ."

HKI made a contract with Douglas dated July 11, 1980, (Plaintiff Exhibit 11) for sale and purchase of certain property on High Knob. In the course of and as a part of that transaction, the purchasers received a copy of the 1978 HUD Property Report.

HKI made a contract with Kaufman, dated October 6, 1985 (Plaintiff Exhibit 12) for sale and purchase of certain property on High Knob. This contract provided for a $1,500 down payment, and the balance of $8,000 was payable in "96 monthly installments . . . ."

HKI made a contract with Lawson, dated May 15, 1980, and August 10, 1980 (Plaintiff Exhibit 13) for sale and purchase of certain property on High Knob. As a part of that transaction, the purchasers received a

copy of the 1980 Property Report. The language of this contract was like that of the Ingegneri contract and provided for the payment of the balance "in monthly installments of $106.02 . . . ."

HKI made a contract with Lazear dated January 13, 1987 (Plaintiff Exhibit 14) for sale and purchase of certain property on High Knob.

HKI made a contract with Peterson dated August 9, 1981 (Plaintiff Exhibit 16) for sale and purchase of certain property on High Knob. As a part of this transaction, Peterson received a copy of a "Fact Sheet" dated June 1, 1981. This contract provided for a down payment with the balance to be paid in "94 monthly installments of $283.35 . . . ."

After some date in 1981, HKI no longer distributed HUD Property Reports to prospective purchasers. Instead, purchasers were given "Fact Sheets" with questions and answers about High Knob. (Plaintiff Exhibit 18). The June 1, 1981, "Fact Sheet," received by Peterson contains the following representations (Page 5):

> We [HKI] formed an Owner's Association in accordance with the Virginia Subdivided Land Sales Act of 1978 on 1 July, 1978 . . . . You will be given one vote for each lot you own in the development.
>
> We will be the only voting member of the association . . . until we transfer the common facilities and amenities to the association . . . . We will transfer ownership to the association in accordance with Virginia Law . . . .

Prior to July 1, 1978, no Owners Association with mandatory membership existed at High Knob. A private club or "Lodge" operated the recreational amenities. Membership in the Lodge was voluntary and could be terminated by either the management or by the member.

After July 1, 1978, the Lodge ceased existence, and its operations were incorporated into those of the Owners Association.

On or after November 30, 1978, the Developer sent a memorandum (Plaintiff Exhibit 20) to the High Knob lot owners, which contained the following statement:

> A new Virginia Subdivided Land Sales Act effective 1 July, 1978, requires High Knob to form an Owners Association and to transfer common facilities, club, roads and water to that Association when 75% of all lots are sold or when all the common facilities are completed. The new law makes membership in this Association mandatory for all lot owners . . . .

As required by law, High Knob has formed an Owners Association and you are now a member of this Association.

Existing lot owners were sent a notice of the 1979 Annual Meeting of the High Knob Owners Association which represented that "Virginia State Law requires" all lot owners to belong to the Owners Association (Plaintiff Exhibit 21). The minutes of the July 5, 1979, Annual Meeting of Members (Plaintiff Exhibit 19) show that the lot owners were told at that meeting that the "Association was formed to comply with the Virginia Subdivided Land Sales Act . . ." and that the common facilities would be transferred to the Association when "High Knob, Inc., had either sold 75% of the lots . . . or had completed the entire water system, recreation facilities, and road system."

From July, 1978, through and including at least August, 1982, HKI continued to make claims and representations to lot owners to the effect that the Subdivided Land Sales Act applied to High Knob and made membership in the Association mandatory. (See Plaintiff Exhibits 22, 24, 25).

HKI and its successor HKA have continued to represent and claim that membership in the Association is mandatory "according to Virginia law" for *all* lot owners, including those who purchased prior to 1978, such as Bardwell and Ruffing.

In 1978, HKI prepared a "Declaration" which described the common facilities at High Knob, and the terms under which the common facilities were to be transferred to the Association (Plaintiffs Exhibit 4). While this document was maintained in the records of the Association, it was never recorded among the land records of Warren County.

Of the defined common facilities, the roads and recreational facilities are complete. The water system is not complete and will not be complete until there is sufficient water production and storage capacity to supply an approved "tap" to each buildable lot in accordance with the requirements of the Commonwealth of Virginia.

On or about November 15, 1982, HKI caused an amendment to be made to the declaration and bylaws of HKOA which changed the time of transfer of the common facilities until not less than 95% of the lots at High Knob were sold.

The Articles of Incorporation of HKOA give the developer the sole vote with respect to the affairs of HKOA, which includes amendment of its bylaws and corporate documents, and the transfer of property.

Under the original Articles of Incorporation of HKOA, the developer retained the sole vote so long as it retained interest in any lot at the High Knob development, i.e., so long as it shall be the record owner of a fee or undivided fee interest in any lot.

As of April 20, 1981, HKI voluntarily suspended its HUD property reporting after learning from representatives of the Agency that HKI qualified for the 12-lot exemption, pursuant to the provisions of 15 U.S.C. § 1702(b)(2). The last HUD property report filed by HKI was in August of 1981.

On or about November 15, 1982, the voting member of HKOA attended the special meeting of HKI, at which time the HKOA bylaws were amended to provide that transfer of the common facilities to HKOA would take place upon the sale of 95% of the lots, rather than 75%.

Oral notice of the amendment to HKOA's bylaws changing the transfer percentage was made at the regularly-scheduled annual meeting of the members of HKOA in 1983 and again in 1984 as reflected in the minutes of the annual meeting of HKOA. The change was announced again to the members at HKOA's regularly scheduled annual meeting in July, 1984.

On and after April 20, 1981, High Knob was exempt from registration and disclosure requirements of the Interstate Land Sales Act, 15 U.S.C. 1701, *et seq.*, under the 12-lot exemption provisions of 15 U.S.C. 1702(b)(2) until 1991. Thereafter, the necessary filings have been made.

In the period from July 1, 1978, through 1981, the only plaintiffs to this suit who received copies of the HUD property report were the Douglases and Lawson.

Plaintiffs had access to the books and records of HKOA, which were maintained at High Knob under the supervision of HKI or HKA. None of the Plaintiffs were ever barred from seeing the books and records relevant to the claims made regarding the change in percentage when the common facilities were to be transferred to HKOA.

## II. *Conclusions of Law*

### *Declaratory Judgment*

Virginia Code § 8.01–184 of the Code, commonly known as the Declaratory Judgment Act, provides that:

> In cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for. Controversies involving the interpretation of deeds, wills, and other instruments of writing, [and] statutes . . . may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.

This act "does not require one to wait until a right has been violated to seek judicial relief." *Portsmouth Restaurant Assn. v. Hotel & Restaurant Employee's Alliance*, 183 Va. 757, 763, 33 S.E.2d 218 (1945). The purpose of the act is to permit the declaration of the parties' rights before they mature. *Liberty Mutual Ins. Co. v. Bishop*, 211 Va. 414, 421, 177 S.E.2d 519 (1970). Thus, a declaratory judgment action was held proper to construe a lease and determine if the lessee and his employees and customers were subject to criminal liability for trespass, since no adequate remedy was available by customary process. *Hop-In Food Stores, Inc. v. Serve-N-Save, Inc.*, 237 Va. 206, 373 S.E.2d 753 (1989). In *Cowardin v. Burrage*, 195 Va. 54, 77 S.E.2d 428 (1953), it was held that a controversy over the right of the petitioners to employ certain professionals under the provisions of a particular section of the Code of Virginia presented a proper case for declaratory judgment.

### The Virginia Property Owners Association Act

Va. Code Ann. 55–508, *et seq.*, has no application to these claims because the HKOA charges or dues are less than the $150 threshold provided for by the Act.

### The Virginia Subdivided Land Sales Act

The Virginia Subdivided Land Sales Act, § 55–336 *et seq.*, expressly creates no private right of action for violation of the terms of that title, and this Court will imply none. Violations of that act are enforced by the Virginia Real Estate Board. Va. Code § 55–345.

The act covers "any subdivision of land into one hundred or more lots . . . sold or disposed of, by land sales installment contracts, and pursuant to a common promotional plan, where lot purchasers within

said subdivision have use of and access to the facilities and amenities within such subdivision for which the said lot owners are assessed on a regular or special basis for the use and enjoyment thereof." Virginia Code § 55–337(5)(a). The term "land sales installment contract" is defined in the act as "any installment contract for the sale or disposition of land whereby the purchaser does not receive a deed conveying the property until part or all installment payments are made as called for in the contract and record title to the property remains in someone other than the purchaser pending full performance of the contract." Virginia Code § 55–337(11). The Defendants contend that seller financing using the traditional device of a note and deed of trust, as was done when the sales at issue in this case actually closed, removes these sales from the definition of "land sales installment contract," but otherwise High Knob would qualify as a subdivision subject to the act.

Section 55–337(11), which defines a land sales installment contract, is clear and unambiguous. "If a statute is clear and unambiguous, a court will give the statute its plain meaning." *Loudoun County Dept. of Soc. Services v. Etzold*, 245 Va. 80, 425 S.E.2d 800 (1993). *Merriam Webster's Collegiate Dictionary* (10th ed. 1993) defines installment as "one of the parts into which a debt is divided when payment is made at intervals." The statute does not specify any number of installments required to trigger the jurisdiction of the act, nor does it provide that a contract specifying a down payment with the balance payable in installments, which is actually closed by a deed being delivered and the seller's taking back a deed of trust, is exempt from the act. See exemptions: Virginia Code § 55–338. The Supreme Court of Virginia has described a contract for the purchase of land in three payments, so structured for federal income tax purposes, as an "installment sale." *Martin v. Terjelian*, 231 Va. 365, 367, 344 S.E.2d 894 (1986). The Subdivided Land Sales Act is remedial, and "[r]emedial statutes are to be construed liberally to remedy the mischief to which they are directed in accordance with the legislature's intended purpose." *Carmel v. City of Hampton*, 241 Va. 457, 460, 403 S.E.2d 335 (1991).

The Defendants contend that two payments do not constitute an installment sale, but the statute does not say that. A rose by any other name is still a rose, and a contract which calls for performance on at least two different times is an installment contract. *See* Virginia Code § 8.2–612 (definition of installment contract in the Uniform Commercial Code). It is the form of the contract when it is signed which

determines whether the act applies because, after the signing of a contract calling for two payments or two hundred, the parties' rights are the same. "When such a contract [for the sale of land] is concluded, although it is wholly executory in form, it clothes the purchaser with an equitable title and the vendor with equitable ownership of the purchase money." *Sale v. Swann*, 138 Va. 198, 208, 120 S.E.2d 870 (1924). All of the contracts of the Plaintiffs called for at least two payments, and the Ingegneri, Cockerell, Kaufman, Lawson, and Peterson contracts all provide for more than ninety installments. Defendants contend that because in all of these transactions the seller developer ultimately gave a deed and received a deed of trust to secure its financing, the act does not cover these contracts. To read the statute as requiring three or more payments before it applies, or to read it as saying that, if an installment contract is first used, but a deed of trust later taken back by the seller after giving the purchaser a deed, the transaction is removed from the act, would require reading into the statutes requirements and exemptions not expressed, and the Virginia Supreme Court is very reluctant to read provisions into statutes which are not expressed. *See, Makarov v. Commonwealth*, 217 Va. 381, 228 S.E.2d 573 (1971). "For this Court to place any limitation on the clear and comprehensive language of the statute, or to create an exception where none exists under the guise of statutory construction, would be to defeat the purpose of the enactment and to engage in judicial legislation." *Town of Crewe v. Marler*, 228 Va. 109, 114, 319 S.E.2d 748 (1984).

The Subdivided Land Sales Act makes membership in the owners' association mandatory and grants such associations the power to collect assessments, place liens, and take other actions which HKI and HKA have ascribed to or claimed for the High Knob Owners Association, Inc. In the present case, the Plaintiffs seek a determination of their rights pursuant to their contracts with the developer and also pursuant to the Virginia Subdivided Land Sales Act of 1978, § 55–336, *et seq.* of the Code. Although the SLSA does not explicitly provide for a private right of action for lot owners, it does contain specific requirements which must be followed by developers of subdivisions which are subject to the act. Section 55–344 provides that "the covenants, deed restrictions, articles of incorporation, bylaws or other instruments for the management . . . [of subdivisions regulated by the SLSA] shall provide for . . ." certain processes and procedures for the protection of

the lot owners. Several of the Plaintiffs claim specific contractual entitlement to developer compliance with the SLSA, although the time stated in their contracts for transfer of the common amenities and surrender of control over the Owners' Association has not arrived. However, the developers have denied that they are obligated to comply with the Act, and, if the parties' rights are not judicially declared, the developers may feel free to take further action which would make compliance with the Act and contract at the stated time a practical impossibility. This set of circumstances is precisely the type of case which the General Assembly contemplated when the Declaratory Judgment Act was enacted.

### The Interstate Land Sales Act

The Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, *et seq.*, forbids selling any lot when any statement in the HUD report is untrue or where a material fact required to be stated is omitted or using any device or scheme to deceive the purchaser. Both HKI and HKA have made representations concerning the status of the Home Owners Association under Virginia law which the plaintiffs now assert were untrue. When one represents as true that which is not true, and another relies thereon to his damage, the latter may recover for the false representation whether it was knowingly or innocently made. *Chandler v. Russell*, 164 Va. 318, 326, 180 S.E. 313 (1935); *Mears v. Accomac Banking Co.*, 160 Va. 311, 168 S.E. 740 (1933). When the developer represented that the common facilities would be transferred "according to Virginia Law," when 75% of the lots had been sold or the common facilities completed, HKI was making a statement of fact.

In *Flint Ridge Development Company v. Scenic Rivers Association*, 426 U.S. 776, 49 L.Ed.2d 205, 96 S.Ct. 2430 (1976), the United States Supreme Court held that the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. § 1701 *et seq.*, is designed to prevent deceptive practices in the interstate sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers and is based on the full disclosure provisions and philosophy of the Securities act of 1933, 15 U.S.C. § 77a *et seq.* Section 1703 of the Interstate Land Sales Act is essentially an anti-fraud provision, *see Campbell v. Glacier Park Company*, 381 F. Supp. 1243 (D. Idaho 1974).

## The HUD Statements and the Contracts

Where a contract or transaction is based upon more than one document, all the documents must be read and construed together to determine the intent of the parties and the meaning of each document. No document, nor any word or clause in a document will be treated as meaningless so long as a reasonable meaning consistent with the rest of the contract can be ascribed to it. *Daugherty v. Diment*, 238 Va. 520, 525, 385 S.E.2d 572 (1989); and *American Realty v. Chase Manhattan Bank*, 222 Va. 392, 403, 281 S.E.2d 825 (1981).

It appears that recognition of the salutary anti-fraud provisions of the Interstate Land Sales Act led the Virginia Supreme Court in *Marriott v. Harris*, 235 Va. 199, 368 S.E.2d 225 (1988), to hold that the HUD statements were part of the purchasers' contract even though the purchasers' contract contained an integration clause and did not expressly incorporate by reference the HUD statements. The Marriott contract contained the following language in capital letters:

> PURCHASER . . . HEREBY ACKNOWLEDGES RECEIPT OF A PROPERTY REPORT PREPARED PURSUANT TO THE INTERSTATE LAND SALES FULL DISCLOSURE ACT, THAT HE HAS READ AND UNDERSTANDS SUCH REPORT, [AND] THAT HE HAS INSPECTED THE LOT TO BE PURCHASED HEREBY . . . .

The *Marriott* court held at 214–215 that the HUD Property Report distributed by the developer to purchasers became a part of the contract, notwithstanding an "integration clause" in the contract form which specified that it was the only agreement between seller and purchaser and that no representations had been made or relied upon which were not therein "provided [for] or set forth," and where the contract language did not explicitly incorporate by reference the HUD Statement as in *Degler v. Lake Holiday Estates, Inc.*, 368 F. Supp. 367 (W.D. Va. 1975), *rev'd on other grounds* 556 F.2d 572 (4th Cir. 1977). *Cf., Spotsylvania County v. Seaboard Surety Co.*, 243 Va. 202, 212, 415 S.E.2d 120 (1992) (construction of contract with integration clause in the absence of underlying remedial legislation like the Interstate Land Sales Act). Plaintiffs Douglas purchased from HKI and received a Property Report dated July 10, 1978 (Plaintiff Exhibit 2A). The Douglas contract contained the following language in capital letters:

YOU HAVE THE RIGHT TO VOID YOUR CONTRACT OR AGREEMENT . . . IF YOU DID NOT RECEIVE A PROPERTY REPORT IN ADVANCE OF OR AT THE TIME OF YOUR SIGNING THE CONTRACT . . . .

The Property Report itself contains, on its cover, in very large type the warning: "PURCHASER SHOULD READ THIS DOCUMENT BEFORE SIGNING ANYTHING"; and the statement that it "is unlawful for anyone to make . . . any representations which differ from the statements in this Property Report."

Plaintiff Lawson purchased from HKI and received a Property Report dated August 5, 1980 (Plaintiff Exhibit 5). The contract form contained capitalized language similar to that in the Douglas contract, and the Property Report itself contained a similar large warning to "READ THIS REPORT BEFORE SIGNING ANYTHING." In addition, paragraph (8) on the second (reverse) page of the contract form states that:

> Seller [HKI] hereby specifically agrees and is obligated to complete the roads and the water system proposed in the Property Report by the dates set out in the Property Report dated 5 August 1980.

The language in the Douglas and the Lawson contract forms are "amply sufficient" to incorporate the Property Reports as a part of the contracts, thus obligating the developer to perform the various promises contained therein, under the holding of *Marriott v. Harris, supra.* Any difference between the language of the Marriott contract and that of the Lawson and Douglas contracts is very subtle and does not materially distinguish the Lawson and Douglas contracts from the contract in *Marriott.*

### Statute of Limitations

Ordinarily, "the applicability of the statute of limitations is determined by the object of the litigation, not the form in which it is filed." *Board of Sup. of Fairfax v. Thompson Associates,* 240 Va. 133, 139 (1990), quoting *Friedman v. People's Service Drug Stores,* 208 Va. 700, 160 S.E.2d 563 (1968). In this particular case, the plaintiffs assert several causes of action, both common law and statutory. A right of action is a specific legal claim for relief arising from a transactional set of facts. In *Stone v. Ethan Allen,* 232 Va. 365, 368–369, 350 S.E.2d

629 (1986), the Supreme Court of Virginia noted the elements of a right of action:

> There can be no right of action until there is a cause of action. *Caudill v. Wise Rambler*, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969).
>
> The essential elements of a cause of action, whether based on a tortious act or breach of contract, are (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that duty or right, and (3) harm or damage to the plaintiff as a proximate consequence of the violation or breach . . . . A cause of action does not evolve until all of these factors are present.

Generally, the earliest time at which a statute of limitations begins to run is from the time that the plaintiff sustains damage. *See* 51 Am. Jur. 2d, *Limitations of Actions*, § 109. Consistent with the general rule, Virginia Code § 8.01–230 specifically provides that "in every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitations period shall begin to run from the date . . . when the breach of contract or duty occurs in the case of damage to property and not when the resulting damage is discovered . . . ."

In *Roberts v. Cole Processing Corp.*, 235 Va. 556, 561, 369 S.E.2d 188 (1988), the Supreme Court held that:

> In the case of an indivisible or entire contract, a party seeking to recover for a breach committed while the contract remained executory, before an anticipatory breach committed before expiration of the time agreed upon for full and final performance, has the election of pursuing his remedy when the breach occurs, or awaiting the time fixed by the contract for full and final performance. If he elects the latter course, *the statute of limitations does not begin to run against his right of action until the time for final performance fixed by the contract has passed* (emphasis added).

In cases of anticipatory breach, the statute of limitations runs from the time fixed for performance and not from the time of the anticipatory breach.

> Since on the happening of an anticipatory breach, the promisee has the right, according to practically all the authorities, to await the time for performance and bring suit when that time has arrived, the statute of limitation on the promisee's right of action does not begin to run until the time for performance fixed by the terms of the contract.

*Simpson v. Scott and Haley, Ex'rs*, 189 Va. 392, 398, 53 S.E.2d 392 (1949). *Accord, Andrews v. Sams*, 233 Va. 55, 58 (1987); *County School Board v. Beiro*, 223 Va. 161, 163 (1982); *Simpson v. Scott*, 189 Va. 392, 400 (1949).

The provisions of the Lawson and Douglas contracts fixed no particular time for transfer of the common facilities, but rather provided for performance upon the occurrence of a condition subsequent, so the rights of action of the lot owners to compel conveyance of the common facilities does not arise until more than 75% of the lots have been sold or the common facilities completed, and neither of these two events has yet occurred, so this action is not barred by the statute of limitations.

### The Bylaw Change

In November, 1982, without prior notice to the lot owners, nor even notice to the "lot owner representative" on the Board of Directors, HKI amended the Owners' Association Bylaws and the Declaration. The Declaration is the instrument whereby the common property of the subdivision is defined and the terms of transfer are specified. The Declaration is under the physical control of the Developer and has never been recorded. The Declaration itself contains no provision which would allow any amendment upon any terms.

> Unless required by the by-laws, where a corporate meeting is stated and general, no notice is ordinarily required of the nature of the business to be transacted. However, where an action of importance, which is extraordinary and outside the usual business transacted at the regular or annual meetings of the stockholders is to be taken, a notice thereof must be given.

*Miller v. International Union of United Brewery, Flour, Cereal, and Soft Drink Workers of America*, 187 Va. 889, 48 S.E.2d 252 (1948), quoting 18 C.J.S., *Corporations*, § 544d(3), p. 1230.

Virginia Code § 13.1–842 requires notice of all special meetings to be given to all members entitled to vote, and the Subdivided Land Sales Act requires that lot owners have a right to vote. Article II of the Association Bylaws provides that members are entitled to one vote per lot. Defendant Exhibit 4. Furthermore, § 13.1–900 requires notice to *all* members "whether or not entitled to vote" before a corporation may sell or "otherwise dispose of" all or substantially all of its property otherwise than in the usual and regular course of business. Since the only asset of the Owners' Association was the right, pursuant to the 1978 Declaration, of a transfer of the common facilities at 75% sales or completion of the common facilities, the November, 1982, actions of HKI as "sole voting member" amounted to "disposing of" substantially all of the Association's assets. Since no notice was given to lot owners of the members meeting and since the amendment violated the Virginia Subdivided Land Sales Act, the amendments to the Bylaws and Declaration are void. *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust*, 243 Va. 53, 413 S.E.2d 599 (1992).

## III. *Decision*

For the foregoing reasons, it is adjudged and ordered as follows.

The HUD statements are part of the Lawson and Douglas contracts. High Knob is subject to the Virginia Subdivided Land Sales Act.

Upon completion of the common facilities or upon the developer's transfer of legal or equitable ownership of 75 percent of the lots at High Knob, the common facilities will be transferred, without further consideration, to the High Knob Owners Association pursuant to the contracts with Lawson and Douglas and the Virginia Subdivided Land Sales Act.

The lots in High Knob are subject to fees and assessments as provided in the Declaration and the Virginia Subdivided Land Sales Act.

After the trial, the Defendant filed a motion to file supplemental exhibits, which is granted. However, the supplemental exhibits do not alter the decision of the court because the time for performance has not yet occurred, so it is problematic as to whether the common facilities will be encumbered when the time for transfer of the common facilities to the Owners Association arrives.