## CIRCUIT COURT OF PRINCE WILLIAM COUNTY

City of Manassas

 v.

Prince William County
Board of Supervisors

March 16, 1994

Case No. (Chancery) 35771

BY JUDGE THOMAS S. KENNY

 This case involves the construction and effect of an interjurisdictional agreement between Prince William County and the City of Manassas regarding, among other things, jurisdiction over the ground on which the county courthouse and other county buildings are located.

### Background

 When the Town of Manassas became an independent city in 1975, the City and the County negotiated an agreement to handle the transition. Numerous topics were covered, including schools, water, library facilities, and other services to be provided by one or the other of the parties. Also included was a provision that the City would "institute proceedings" to transfer jurisdiction over the "courthouse complex" back to the County. The "courthouse complex" consisted of approximately 38.4 acres of land owned by the County within the old Town, on which was located the courthouse and other County facilities.

 The apparent intention of the parties was to carve out a piece of the City and return it to County status, thereby creating what has been referred to in the trial of this matter as a "hole in the doughnut." This intention was never formally carried out, but the parties apparently managed to co-exist peacefully until a dispute arose around 1990 over the County's plans to enlarge the jail and the judicial center on the

courthouse complex. The City opposed the idea, and the County favored it. Each side asserted jurisdiction to decide the issue, and the parties were unable to achieve a political solution to the impasse. As a result, they have turned to litigation.

The City filed this suit to seek a declaratory judgment that the courthouse complex is still within the city limits and subject to the jurisdiction of the City. The County counterclaimed that by reason of the transition agreement, jurisdiction had been "equitably converted" to the County; in the alternative, the County asked for specific performance of the transfer provisions of the transition agreement.

Since all of the judges in the Thirty-first Circuit recused themselves from considering the case, I was assigned to the trial of the case by designation of the Supreme Court. We had several sessions of pretrial motions, including some by conference telephone, and three days of trial testimony. I am prepared to make the following findings of fact and conclusions of law.

### Findings of Fact

The County owns approximately 38.4 acres of land, generally bounded by Robnel Avenue on the north, Center Street on the south, Bennett Elementary School on the west and Grant Avenue on the east, which property is known as the "Courthouse Complex." For scores of years, prior to incorporation of the City in 1975, the County courts, jail facilities, police facilities and other administrative offices have continuously existed in the Courthouse Complex. For this period the Courthouse Complex has served as judicial/correctional complex.

The City was incorporated from a town in 1975 as a city of the second class independent of the County and at that time, the Courthouse Complex was within the legal and equitable jurisdiction of the City of Manassas.

As a result of the Town transitioning to city status, the City and the Board of Supervisors of Prince William County along with the respective school boards of the two entities, entered into an agreement dated April 12, 1976 ("1976 Agreement"). (Pl. Ex. 11; Def. Ex. 1.)

The 1976 Agreement included a paragraph D which stated:

### D. Courthouse Complex

City agrees to institute proceedings necessary to exclude from its corporate boundaries and from the jurisdiction of the City

the contiguous property constituting the courthouse complex as per the attached map, provided that such property shall again become incorporated within the City corporate limits in the event that the Prince William County Courthouse is relocated, and Council and Supervisors agree that any court order or legislation entered in furtherance hereof shall contain a reversionary clause to such effect.

During the negotiations of the 1976 Agreement, the Courthouse Complex included public works, health department, the clerk of the court, the Sheriff's department, board of supervisors' offices and chambers. The circuit court was in a modular building within the Courthouse Complex but removed from the "old Courthouse." The county administration building which included the chambers of the Board of Supervisors was connected to the building which housed the Clerk of Court immediately behind the "old Courthouse" building.

Today, other public facilities within the Courthouse Complex include: the Judicial Center, the Adult Detention Center ("ADC"), the Modular Jail, the Senior Citizens Center, the Health Department offices, a police substation, courthouse annex, Old Bennett School, offices and a repair shop. The Judicial Center, the ADC and the Modular Jail were all constructed after 1976 to replace the previous court and jail facilities which had been located with the Courthouse Complex. The Senior Citizens Center was also constructed after 1976.

The Chairman of the Board of County Supervisors of Prince William County and the Mayor of the City of Manassas signed the 1976 Agreement after being duly authorized to do so by their respective governing bodies.

Legal counsel for the City and the County were available throughout the negotiations of the 1976 Agreement. In fact, each side hired special counsel for their expertise in interjurisdictional matters.

The idea of removing the Courthouse Complex from City jurisdiction was advanced by then Mayor Parrish and agreed to in principle at the conclusion of the final extended negotiating session which began on April 11, 1976.

The City wanted to keep the Prince William County Courthouse where it was located because the courthouse provides a substantial benefit to the City.

As a result of preliminary inquires made by the City in October, 1976, the City knew that Fairfax City had created a "doughnut hole"

inside its boundaries in which Fairfax County had jurisdiction. Fairfax City had instituted proceedings in 1967 by adopting an ordinance pursuant to Section 15.1–1059 of the Code of Virginia which was approved by the Fairfax Circuit Court and by the General Assembly.

With respect to Paragraph D, the City expected that it would institute legal proceedings to de-annex or retrocede the Courthouse Complex to the County in the manner accomplished by Fairfax City and Fairfax County. The Fairfax City provision differed from Paragraph D in that Fairfax City did not have a reverter clause.

Neither side has presented evidence describing the agreed to "proceedings" with any certainty or definiteness, other than by reference to the Fairfax proceedings.

The City believed that Paragraph D could be lawfully performed in the manner of Fairfax City until on or about October 5, 1976, when the Assistant City Attorney, Mr. Bendall, advised the City Council and the Acting County Attorney, Mr. Horton, of his reservations as to its legality.

The County, through its Acting County Attorney, acknowledges that it received Mr. Bendall's October 5, 1976, letter. Mr. Horton testified that he believes he forwarded a copy of it to the County's Director of Public Works for assistance with a legal description of the Courthouse Complex. Mr. Horton also testified that he believes he sent the letter on to the special counsel in Winchester retained by the County for the purpose of negotiating the transition agreement, and then felt that he had no further responsibility in the matter. No evidence of such a transmittal was offered, and there was no evidence that the special counsel, Mr. David André, ever received or responded to the letter. Given the nature of the concerns raised in the letter, it is almost inconceivable that a lawyer specially selected for his expertise in this area would not have realized the implications of it and reacted immediately. Accordingly, I am unable to find as a fact that Mr. Bendall's concerns were ever brought to Mr. André's attention.

Mr. Bendall's letter of October 5, 1976, represented preliminary efforts by the City preparatory to instituting Fairfax-type proceedings. However, the County did not respond to his request for a legal description of the Courthouse Complex, or to Mr. Bendall's concerns about the illegality of special legislation, which had been used in the Fairfax proceedings. Neither side sought an opinion from the Attorney General or pursued the possibility of seeking general legislation.

The City has not repeated its 1976 request for information, nor has it otherwise sought legislation or instituted court action to transfer jurisdiction of the Courthouse Complex to the County as required by Paragraph D.

The County has performed its obligations under the 1976 Agreement, including but not limited to: providing library services to the City in accordance with Paragraph B(3); providing Chapter 10 services (mental health/mental retardation/and substance abuse services) to the City in accordance with Paragraph B(4); and performing its obligations concerning police radio frequencies in accordance with Paragraph B(5) of the 1976 Agreement. With the exception of Paragraph D, the City has performed its obligations under the 1976 Agreement.

After execution of the 1976 Agreement, the County turned to address an array of other major pressing issues confronting the County, and did nothing to require the City to implement Paragraph D. There was little urgency to do so, because the City and the County were able to cooperate on many interjurisdictional matters concerning the use of the Courthouse Complex. Such cooperative undertakings included construction of a new courthouse, the ADC, the Modular Jail and the Senior Citizens Center.

The City has consistently provided governmental services within the Courthouse Complex since 1976, including:

(i) the City has primary responsibility for responding to calls for law enforcement in the Courthouse Complex and violators are charged under City ordinances;

(ii) the City is responsible for making fire inspections;

(iii) the City responded to the County's request to vacate streets within the Courthouse Complex;

(iv) the City responded to the County's request for designating limited parking;

(v) the County pursued a request for a special use permit to construct a communication tower;

(vi) the County recognized the need for its Sheriff to coordinate with the City Police since the "Judicial Center is within the City;"

(vii) the County requested an occupancy determination at the Judicial Center;

(viii) in October, 1982, the County objected to the entire Courthouse Complex being included in a City historic district which imposed certain restrictions on landowners. However, the district was created;

(ix) in 1986, the County sought approval from the City's Architectural Review Board to demolish some buildings within the Courthouse Complex. Approval was denied by the Board but ultimately given by City Council;

(x) the County pursued a special use permit in 1988 for the initial construction of the modular jail in the Courthouse Complex;

(xi) the City is responsible for all ongoing building inspections in the Courthouse Complex although initial construction is handled on a case by case agreement between the City and the County.

No evidence was presented that the County claimed rights under Paragraph D until a July 21, 1992, letter from Chairman Seefeldt to Mayor Browne stating that the County believed that it had jurisdiction over the Courthouse Complex by virtue of Paragraph D of the 1976 Agreement.

Since asserting its rights in 1992, the County has acted as if it had jurisdiction over the Courthouse Complex. Specifically:

(i) The County authorized County staff to employ consultants for the jail and judicial center expansion projects and to operate under the assumption that the County had jurisdiction over the Courthouse Complex.

(ii) The County proceeded with plans for new jail facilities within the Courthouse Complex because of the need to make room for the projected growth in jail population and because the County believed that the best location for the expansion was adjacent to the existing ADC.

(iii) Recently, the County has made numerous interior modifications to the facilities within the Courthouse Complex without seeking the approval of the City, and commenced design of expansion of the Judicial Center and the ADC.

(iv) The County has obtained County building permits on various construction projects that have been and are being undertaken within the Courthouse Complex, including for improvements to the Judicial Center.

(v) However, the City continues to provide police and fire services, traffic control and parking enforcement.

### Conclusions of Law

I. Based on the foregoing facts, the Courthouse Complex is still within the corporate limits of Manassas and subject to the jurisdiction

of the City. It is clear that no action has been completed which serves to transfer jurisdiction to the County. Indeed, the only action that seems to have been started was a request by an Assistant City Attorney to the Acting County Attorney for a legal description of the Complex, to which no response was ever made.

## A. *Equitable Conversion*

The County argues that the doctrine of "equitable conversion" effectively transferred jurisdiction over the Complex to the County when the parties agreed (in 1976) to do so. Equitable conversion is a principle whereby, for example, a contract purchaser of real property is deemed to be the real party in interest in owning the property, while the contract seller's interest is effectively converted to a personal property interest. *Clay v. Landreth*, 187 Va. 169 (1948). In such a case, the principle has value, for example, in allocating the risk of loss (*Bryant v. William Real Estate Co.*, 350 S.E.2d 748 (W. Va. 1986)), or in determining whether land which is the subject of an executory contract of sale passes in a decedent's estate as personalty or realty (*Johnson v. Merritt*, 125 Va. 162 (1919)).

But that situation is a far cry from the one at hand. Here, we are dealing with issues of sovereign jurisdiction. Neither side has been able to identify any authority, either within or without the Commonwealth, in which the principle of equitable conversion was raised in the context of transfer of sovereign jurisdiction. To the extent, then, that this is an issue of first impression, I will unequivocally reject the idea that such jurisdiction can be equitably converted. Sovereigns are not subject to estoppel (*Segaloff v. Newport News*, 209 Va. 259 (1968)), nor to laches (*Norfolk & W. Ry. Co. v. Board of Supervisors*, 110 Va. 95 (1909)). If the rights of sovereigns are so jealously guarded by the courts, to an extent beyond those of other litigants, why, then, should we think that their rights to exercise jurisdiction over territory should disappear simply because there had been an agreement to transfer it at some time in the future?

To take an example from the international scene, there was a treaty between the United States and Panama in 1977 to return jurisdiction over the Canal Zone to Panama. The actual transfer of power did not take place until 1979. In the meantime, there is no doubt that jurisdiction remained firmly in the hands of the United States. More recently, Israel and the Palestine Liberation Organization agreed to transfer lim-

ited jurisdiction over the Gaza Strip and Jericho, but no one seriously would argue that such jurisdiction now rests in the Palestine Liberation Organization.

In short, I think that sovereign jurisdiction is too significant a matter to be left to the principle of equitable conversion. Some affirmative act is required to make the transfer. When Columbus "discovered" the New World, he claimed it for Spain by entering upon each island he encountered with the royal banners flying, and planting a cross in the ground. K. Sale, *The Conquest of Paradise*, at 93–94 (1991). Obviously, we do not expect the chairman of the board of supervisors to do the same thing with the Courthouse Complex, but the point is that something has to *happen* for sovereignty to turn over. Merely agreeing that it *will* happen at some indeterminate time in the future does not make it so.

It is clear that there has been no action taken here which would be the functional equivalent of the County replanting its sword in this ground. Even though the transition agreement imposed on the City the obligation to take some action to cede jurisdiction back to the County, it never has done so. Jurisdiction over the Complex clearly remains with the City. As noted in the Findings of Fact, *supra*, throughout most of the period from 1976 on, the County and the City appeared to act as if they both thought that the City had jurisdiction, even though they also both recognized that the County owned the land. It is the City which has provided primary police and fire protection to the Complex, which has inspected and issued permits for much of the construction on the Complex, and which has issued a special use permit for the modular jail at the County's request. This submissive behavior by the County is not what one would expect from a sovereign which believed that it had already acquired jurisdiction over the complex by virtue of "equitable conversion" or affirmative act. Indeed, counsel for the County commented in the course of argument on one of the motions in this case that the County had for all practical purposes forgotten completely about the transfer provisions of the transition agreement until it was discovered in the files sometime after 1990.

B. *Unclean Hands*

The County claims that the City approaches this litigation with "unclean hands" and therefore the declaratory relief it seeks should be denied. The basis for the "unclean hands" argument is that the City has

failed to do what it was specifically obligated to do under the transition agreement. Even if the doctrine of "unclean hands" were to apply to a sovereign, the evidence in this case does not support such a contention against the City. The agreement was negotiated during a very intense period in early April, 1976, at a time when the parties believed that they could simply copy the "hole in the doughnut" format adopted a few years earlier by the City of Fairfax for the courthouse complex there. A few months later, the City Council was advised by the Assistant City Attorney, Mr. Bendall, that because of changes in the law, it might not be possible. In a letter dated October 5, 1976, Mr. Bendall advised Mr. Horton, the Acting County Attorney, of his specific concerns but indicated that he was willing to try anyway. This was in the same letter in which he asked for a legal description of the Complex. No response was ever received to this letter.

In short, there is ample evidence to support the conclusion that the City acted in good faith in this matter, and concluded that by making the County aware of the problem it had put the ball firmly into the County's court. There is no evidence of unclean hands.

The City is therefore entitled to the declaratory judgment it seeks, namely, that "the property within the Courthouse Complex is within the City's boundaries and under its jurisdiction and not under the jurisdiction of the County of Prince William and is subject to the City's zoning ordinance and other applicable ordinances." *Motion for Declaratory Judgment*, p. 6.

II. At the same time, I believe that the County is entitled to specifically enforce its contractual rights under the transition agreement to have the City institute proceedings to transfer jurisdiction of the Courthouse Complex to the County.

The granting of specific performance is addressed to the sound discretion of the trial court. Although it is not a matter of absolute right, "where the contract sought to be enforced is proved and is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree specific performance as it is for a court of law to give damages for a breach of it." [Citations omitted.]

"When the contract sought to be enforced, has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a de-

fendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension or mistake, relief will be granted by specific performance." [Citation omitted.]

*Haythe v. May*, 223 Va. 359, 361 (1982).

The contract here has been proved by competent and satisfactory evidence. In view of the dispute over the County's plans to enlarge the jail and courthouse, it would obviously work injury and damage to the County to refuse it.

The City contends, however, that the contract is objectionable and is the subject of a mutual misapprehension of law, and that it would be inequitable to enforce it. The City has asserted, first, that the County's request for specific performance is time-barred, either by the statute of limitations or by laches. Second, it argues that the transfer of jurisdiction contemplated by the transition agreement is illegal or impossible to perform. Third, it claims that the transfer provisions of the transition agreement have been terminated by a subsequent agreement between the parties. Finally, it alleges that the transition agreement contemplated a reverter to the City if the County relocated the "courthouse," which the City claims has been done. While I recognize that if any one of these arguments were valid, the County's right to specific performance would be defeated, I do not agree with any of them.

A. *Claim Barred by Time*

As to the time-bar, neither the statute of limitations[1] nor the doctrine of laches applies here. There are, of course, instances in which equity will apply a statute of limitations to what purports on its face to be an

---

[1] Presumably, the statute of limitations that the City would have me apply is the five-year period set up under § 8.01–246(2), relating to actions on contracts in writing. In earlier argument on a plea in bar in this case, the City took the position that where a contract called for action to be taken at an unspecified time (as the transition agreement does), the law would imply a requirement that such action be taken within a "reasonable" time. *Restatement (Second) of Contracts*, § 204 (1981). Further, under Virginia case law, the outer limits of reasonableness appear to be the period of limitation set by statute, *Page v. Shenandoah Life Ins. Co.*, 185 Va. 919 (1947), so that if a breach occurs, it can be deemed to have occurred no later than five years after the contract was entered into. Since the statute of limitations begins to run when the breach of contract occurs, Va. Code § 8.01–230, (*i.e.*, no later than 1981), it would, of course, have long since expired by the time this suit was instituted in 1993.

equitable claim. In *Belcher v. Kirkwood*, 238 Va. 430 (1989), the court applied a three-year limitation to an equitable claim for unjust enrichment, noting that the plaintiff would have been barred by that statute of limitation if she had proceeded in law on an oral contract theory. The *Belcher* court appropriately treated the claim as primarily a legal, rather than purely equitable, one.

Similarly, in *Chesapeake & O. Ry. Co. v. Willis*, 200 Va. 299 (1958), the court employed a statute of limitations analysis to defeat the railroad's suit for specific performance of an 1857 covenant requiring the adjacent landowner to erect fences to keep his cattle off the tracks. The court held that when the landowner's predecessors in title had breached the covenant, it became a personal one and was thereupon subject to the statute of limitations. It is significant, however, that the railroad brought this action essentially as a defense to the landowner's claim for damage to his cattle, due to the railroad's failure to comply with its statutory duty of fencing under § 56–429. In other words, the equitable issue was inextricably bound up with the legal claim, and in this regard, *Willis* is similar to *Belcher*.

Furthermore, the *Willis* court specifically recognized that the railroad's claim "does not appeal to equity and good conscience." 200 Va. at 306. It noted that the covenant sought to be enforced was a century old, that the railroad had done nothing to enforce it during that time, and that it had "slept on its rights." *Id*. It held that it would be inequitable and unjust to grant specific performance under the circumstances of that case.

The City also cites *Marriott v. Harris*, 235 Va. 199 (1988), for the proposition that suits in equity are subject to statutes of limitation. In that case, a purchaser of a lot in a resort community which had never been completed had sued to rescind his contract and recover a refund of money paid already, or alternatively to recover damages for breach of contract. The court assumed that a statute of limitations would apply to the claim, and decided that the appropriate statute was a five-year limitation rather than a two-year. In view of the nature of the claim as being primarily one for recovery of money, I believe that the court's assumption concerning the statute of limitations was correct, and this case is not different from *Belcher* or *Willis* in its analysis.

On the other hand, where purely equitable issues are at stake, statutes of limitations do not apply. *Laurie v. Thomas*, 294 S.E.2d 78 (W. Va. 1982) (Statute of limitations not applicable in suit for rescission).

Although no Virginia cases have been cited by counsel or discovered by the Court's own research which deal with the issue of the applicability of the statutes of limitations to purely equitable issues, there is no reason to believe that Virginia would not follow the same rule of non-applicability set forth in the *Laurie* case. In a purely equitable (*i.e.*, non-monetary) context, the doctrine of laches performs the same function as a statute of limitations in protecting the defendant from damage as a result of a stale claim being presented. *See* the discussion of laches, *infra*.

More importantly, for purposes of this case, statutes of limitations, as well as the doctrine of laches, simply do not apply to a government that is acting in its governmental capacity, seeking to enforce a public right. For example, in *Norfolk & Western Ry. Co. v. Board of Supervisors of Carroll County*, 110 Va. 95 (1909), a railroad had in 1889 taken over a public road to use as a roadbed for its track, on the condition that it build a suitable replacement highway. In 1906, the county government finally sued to require it to build the replacement road.

> There are many reasons which might be suggested for this delayed action on the part of the county authorities, such as the railroad company being in the hands of a receiver for some time, etc.; but this is not necessary, for the reason that the public highways belong to the State, and the complainants represent the sovereign State, *against whose rights the statute of limitations does not run, nor the doctrine of laches apply. As against the government, laches cannot be set up as a defense in equity any more than the bar of the statute can at law. . . . . "Time does not run against the State, nor bar the right of the public."*

*Id.* at 103. (Emphasis added.) *Accord, Board of Supervisors v. Norfolk & W. Ry. Co.*, 119 Va. 763 (1916).

In 1958, the Virginia Supreme Court restated this principle in *City of Portsmouth v. City of Chesapeake*, 232 Va. 158 (1958), where it affirmed again that laches cannot be asserted against municipalities acting in their governmental capacity. In that case, the court also confirmed that the determination and protection of jurisdictional boundaries is a governmental act.

The present case involves the determination of which government has or should have jurisdiction over a particular area of ground. I

believe that is clearly a governmental function, and will therefore hold that neither the statute of limitations nor laches[2] applies to preclude the court from entertaining the County's cross-bill.

## B. *Illegality or Impossibility*

As to illegality or impossibility of performance, the simple answer is that it is too early to tell. The transition agreement calls for the City to "initiate proceedings" to transfer jurisdiction over the Courthouse Complex to the County. There are, presumably, more ways than one to achieve the desired result. I believe that the City Council, acting in good faith and after having been carefully advised, has the right to choose among them. For me to rule now on whether a particular course of action would or would not be an acceptable, permissible or even legal course, would constitute an advisory opinion on an issue that is not now before me.

For purposes of deciding whether to award specific performance, however, it is not necessary for me to make such an advisory determination. It is only necessary to decide if there is any impediment to the City's "institut[ing] proceedings," not to determine in advance what the outcome of those proceedings will be. I see no such impediment, and therefore do not find the contract objectionable on that basis.

## C. *Modification by Later Agreement*

The assertion that the transfer provisions of the transition agreement have been modified by a later agreement between the parties is simply wrong. In October 1983, the parties entered into an agreement concerning the allocation of costs for constructing and equipping the new judicial center on the Courthouse Complex. It set dollar limits on the total cost and on Manassas' share, called on the County to convey to the City a 20% fee ownership in the courthouse land and parking areas, provided for progress payments, defined costs, and assigned street maintenance responsibility for the cul-de-sac in front of the court-

---

[2] There are, of course, other elements to the doctrine of laches than the mere passage of time. "Laches will apply in a specific performance suit only if the delay is accompanied by facts and circumstances tending to show the claimant's intention to abandon the contract. Additionally, the delay must be unreasonable and prejudicial to the other party." *Morris v. Mosby*, 227 Va. 517, 521 (1984). In view of the position I am taking that laches *cannot* apply to the County in this situation, it is not necessary to rule on whether these other elements have been proven by the City.

house. The agreement also contained an integration clause in the following terms:

> 10. This shall constitute the entire Agreement between the parties. There are no promises, terms, conditions or obligations other than those contained herein or required by law; and this Agreement shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties hereto.

The City contends that this language terminates its obligations under the transition agreement because it is a "previous . . . agreement[] . . . between the parties . . . ." That, of course, is true, but so are other agreements between the parties, such as for the provision of water or library services. I have not heard anyone argue that those latter agreements have been terminated by this one. The mere fact that the "courthouse" is the subject of the 1983 agreement, and the "Courthouse Complex" is one of the subjects of the 1976 agreement, means nothing. The clear import of the 1983 integration clause is the same as any other integration clause, namely, that prior negotiations between the parties dealing with the subject matter of this agreement have been fully reduced to writing, and that there are no side deals or unwritten promises to contend with. That is the effect, and the entire effect, that I will give it here.

D. *The Reverter Clause*

Finally, as to the City's contention that the "reverter" clause of the transition agreement has already come into effect, this contention is grounded on two arguments, only one of which was seriously advanced. The reverter clause in Paragraph D provided that the Courthouse Complex:

> shall again become incorporated within the City corporate limits in the event that the Prince William County Courthouse is relocated, and Council and Supervisors agree that any court order or legislation entered in furtherance hereof shall contain a reversionary clause to such effect.

The less-seriously advanced argument about this clause is that when the new judicial center was built in accordance with the 1983 agreement, *supra*, it constituted a "relocation" of the Prince William County Courthouse, even though the new judicial center was built on the

Courthouse Complex itself. It is well that this argument was not advanced too seriously, for it carries little weight. The whole purpose of the transfer provisions of the transition agreement, according to the testimony of every witness who addressed the point, was to induce the County to maintain its presence within Manassas. *See, e.g.*, 12/14/93 *Tr.*, pp. 65–66 (Harry Parrish). Moving the site of any particular function of government around on the grounds of the Complex is clearly not going to be detrimental to that purpose.

The more serious contention by the City is that the County has relocated a number of its *administrative* offices, including the offices and meeting place of the Board of Supervisors, off the complex and completely outside of the City. There are, of course, County facilities and agencies that are using the space vacated by, say, the Board of Supervisors, but it is apparent that many of the more significant executive and legislative functions have been moved off the Complex. This is perhaps what the City was trying to discourage the County from doing, but the question is a much narrower one: when the reverter clause speaks of relocating the "Prince William County Courthouse," does it refer just to the place where the judges sit, or does it refer to the principal administrative center of County government?

Obviously, if "courthouse" means where the judges sit, then there has been no relocation. On the other hand, if "courthouse" means the administrative center of government, a strong case is made that it has indeed left the Complex altogether.

The common meaning of the term "courthouse" is, of course, the place where court is held. The City, in urging the alternative construction equating it to "county seat," points to the case of *Tullidge v. Board of Supervisors*, 239 Va. 611 (1990), in which the Supreme Court overturned sanctions against an attorney who had filed suit to prevent the Board from relocating its administrative offices out of the City of Staunton. The Court found that there was arguably a reasonable basis for the position that Mr. Tullidge had taken, and therefore vacated the sanctions; among the grounds for such "reasonable basis" is that *Webster's Third New International Dictionary* defines "courthouse" in part as the principal building in which county administrative affairs are conducted. However, the significance of the *Tullidge* case for our purposes does not lie in the issue of sanctions, which of course deal with different standards than the determination of the merits of the underlying case. The real meat for us is the underlying case itself; in that

case, Mr. Tullidge was arguing, as the City argues here, that by relocating its administrative offices outside of Staunton, the county was moving its "county seat." For Mr. Tullidge, the significance of that argument was that the county had not obtained voter approval; for Manassas, of course, the significance would be the reversionary clause. However, Mr. Tullidge lost in the trial court and the Supreme Court declined to take the case on appeal.

In other words, under the unreported *Tullidge* matter, moving the County administration out of the City does not constitute a relocation of the "county seat," so long as the courthouse remains there. Whether we give the transition agreement the plain meaning of the word or the more sophisticated construction urged by the City, the result is the same: the Prince William County Courthouse has not been relocated.

For all of the foregoing reasons, then, the County's prayer for specific performance of its agreement with the City is granted. Testimony at trial indicated that the parties were very familiar with the Fairfax model, which involved a series of steps including passage of an ordinance, a petition to the Circuit Court, and an act of the General Assembly. Presumably, this was what they had in mind, but it does not matter: the City is obligated by the agreement to make a good faith effort to return the Complex to County control, whether it uses the Fairfax model or something else. It will need to do so by a means (involving one or more steps) reasonably calculated to offer the best chance for success.

This process must be started forthwith, and the court will retain continuing jurisdiction over this matter in order to monitor and, if necessary, enforce compliance with this ruling. It is not my intention to dictate to the City Council what course it must choose, but in the event that there is disagreement between the parties on the most efficacious solution, I expect to be available as needed to resolve it.